UNITED STATES v. READING CO. et al.

(Circuit Court, E. D. Pennsylvania.  December 8, 1910.)

No. 27.

*(Per Gray, Circuit Judge.)*

1. EVIDENCE (§§ 577½, 579, 580*)—COMPETENCY—TESTIMONY GIVEN IN PRIOR PROCEEDING BEFORE ADMINISTRATIVE BODY.

A copy of testimony shown by a report of the Interstate Commerce Commission to have been given by a witness in an investigation before that body, not otherwise authenticated, is not competent evidence in a subsequent suit in a federal court between different parties and in which different issues are involved.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2410, 2412, 2413; Dec. Dig. §§ 577½, 579, 580.*]

2. MONOPOLIES (§ 17*)—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE —CONTRACTS BETWEEN COAL PRODUCERS.

For many years small producers of coal in the anthracite regions. of Pennsylvania had sold their product to contiguous large operators,. who took it at the breakers and shipped and marketed the same through their own agencies, paying to the sellers therefor a certain percentage of tide-water prices, differing under different contracts. During a general strike of all anthracite miners, at a conference between the producers, in order to induce the selling operators to assent to a settlement by which all miners were to receive increased pay, the purchasing companies agreed to contract with the selling producers under an agreed form of contract by which the purchaser bought the entire product of the seller's mines, to be mined and delivered as the buyer directed, which it agreed should be the seller's just proportion of all the anthracite coal which the requirements of the market might from time to time demand.  The purchasers were also to pay an increased percentage based on the general average price at tide-water during the month, to be determined by an expert accountant.  The making of such a contract was optional with each seller; but several were made, and the accountant made reports which were furnished to all parties interested. and also published in trade journals.  *Held,* that such agreement did not constitute nor evidence a combination or conspiracy on the part of the purchasing companies to restrain or monopolize the sale or control the price of coal in interstate commerce in violation of Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2. 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), but was the legitimate outgrowth of peculiar business conditions, and was to the advantage of the smaller producers by utilizing for the handling of their product the facilities and agencies of the larger companies.  Buffington, Circuit Judge, dissenting.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. §§ 13; Dec. Dig. § 17.*]

3. MONOPOLIES (§ 12*)—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE —COMBINATIONS PROHIBITED.

To constitute a violation of Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), there must be a contract, combination, or conspiracy which in purpose or effect tends to restrain trade or commerce among the states or to monopolize some portion thereof.  There must be a meeting of the minds of two or more to accomplish some common purpose directly violative of the act, or a purpose which will, whether intentionally or not, in effect constitute a restraint of trade and commerce among the several states.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. MONOPOLIES (§ 12*)—WHAT CONSTITUTES—CONSTRUCTION OF ANTI-TRUST ACT.

The mere extent of acquisition of business or property achieved by fair and lawful means cannot be the criterion of monopoly within the meaning of Anti-Trust Act July 2, 1890, c. 647, § 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200); but in addition to acquisition and acquirement there must be an intent by unlawful means to exclude others from the same traffic or business, or from acquiring by the same means property and material things.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, vol. 5, pp. 4570–4574.]

5. MONOPOLIES (§ 24*)—COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE —SUIT FOR INJUNCTION—SUFFICIENCY OF EVIDENCE.

Evidence considered in a suit by the United States against various railroad and coal companies engaged in the production and transportation of anthracite coal in Pennsylvania, charging defendants with having entered into a general combination and conspiracy to restrain and monopolize the production and transportation in interstate commerce of anthracite coal, and to control its price in violation of Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), and *held* insufficient to establish such charge.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 24.*]

*(Per Buffington, Circuit Judge.)*

6. MONOPOLIES (§ 12*)—RESTRAINT OF INTERSTATE COMMERCE—CONTRACT OR COMBINATION RESTRICTING COMPETITION—"RESTRAINT OF TRADE."

One of the purposes of Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), in making illegal every contract, combination, or conspiracy in restraint of trade or commerce among the several states, is to maintain interstate commerce on the basis of free competition, and any contract, combination, or conspiracy, the purpose or direct effect of which is to restrict such free competition by way of transportation or otherwise, is in restraint of interstate commerce and unlawful.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, vol. 7, pp. 6185, 6186.]

7. EQUITY (§ 330*)—PLEADING—MULTIFARIOUSNESS OF BILL—WAIVER.

The failure of defendants to object to a bill on the ground of multifariousness until final hearing, or until after complainant has taken his proofs, is a waiver of objection, and, while the court on such hearing may of its own motion dismiss the bill, it will not do so if that objection does not embarrass or prevent the decreeing of relief.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 663; Dec. Dig. § 330.*]

8. MONOPOLIES (§ 16*)—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE —COMBINATION TO PREVENT BUILDING OF COMPETING RAILROAD.

A combination between railroad companies for the avowed purpose and with the effect of preventing the threatened building of a competitive road for the transportation of coal in interstate commerce, by purchasing, through a corporation, the stock of which they purchased, large coal properties, the prior owners of which had pledged their tonnage to the projected road, thus retaining to certain of the combined roads such tonnage and the tonnage of other coal operators tributary thereto who had no other means of transporting their product, was a combination in restraint of trade and commerce among the several states, and unlawful under Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp.

St. 1901, p. 3200), against which the United States is entitled to injunctive relief under section 4 of the act. Lanning, Circuit Judge, dissenting on the pleadings and evidence.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. § 16.*]

**9. MONOPOLIES (§ 12*)—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE —LEGALITY OF SEPARATE ACTS.**

The fact that the several acts by which the purpose of a combination in restraint of trade and commerce among the several states is effected are, taken in isolation, lawful or intrastate in character, and not within the purview of Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), does not relieve the combination from illegality; but such acts must be viewed as elements of a whole and in the light of their purpose and effect in combination.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

*(Per Lanning, Circuit Judge.)*

**10. MONOPOLIES (§ 16*)—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE—CONSOLIDATION OF RAILROADS.**

The purchase by one railroad company of the stock of another by issuing and exchanging its own stock therefor, both roads being at the time carriers of anthracite coal from Pennsylvania to New York Harbor, but chiefly from different localities, *held* not to constitute a combination in restraint of interstate commerce in such coal, unlawful under Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200); it appearing that the main object of the consolidation was the betterment of the terminal facilities of both roads at New York City and Harbor, which were largely improved thereby to the benefit of the public, and that their competition in the coal carrying business was slight, and the effect, if any, on such competition merely incidental.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. § 16.*]

**11. MONOPOLIES (§ 16*)—COMBINATION IN RESTRAINT OF INTERSTATE COMMERCE —CONSOLIDATION OF RAILROADS.**

The purchase by one railroad company of a controlling interest in the stock of another, which was a competitor in the carrying of anthracite coal between the mines and New York Harbor, did not constitute a combination in restraint of interstate commerce in such coal, or to monopolize such commerce, unlawful under Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), where the predominating motive in the purchase was to preserve traffic arrangements which were very important to the purchasing company, by preventing the purchase of such stock by another company, although its necessary incidental effect was to eliminate competition between the two roads in the coal carrying business.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 12; Dec. Dig. § 16.*]

In Equity. Suit by the United States against the Reading Company and others. Decree granting the relief prayed for in part, and for defendants in part.

J. C. McReynolds and G. Carroll Todd, Special Assistants to the Attorney General, for the United States.

Robert W. De Forest, Samuel Dickson, and Jackson E. Reynolds, for Central R. R. of New Jersey and Lehigh & Wilkes-Barre Coal Co.

Alexander & Green, for Mercantile Trust Co.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Charles Heebner, J. D. Campbell, and John G. Johnson, for Philadelphia & R. Ry. Co., Philadelphia & R. Coal & Iron Co., and Reading Co.

Willard, Warren & Knapp, for Temple Iron Co.

J. Claude Bedford, for St. Clair Coal Co.

James H. Torrey and William S. Opdyke, for Delaware & Hudson Co.

Welles & Torrey, for Enterprise Coal Co., North End Coal Co., and Green Ridge Coal Co.

R. H. Patterson, for People's Coal Co.

Thomas F. Wells, for Pine Hill Coal Co. and Nay Aug Coal Co.

W. W. Watson, for Austin Coal Co.

Henry W. Palmer, for Parrish Coal Co.

Frank H. Platt, J. F. Schaperkotter, and George W. Field, for Lehigh Valley R. Co. and Lehigh Valley Coal Co.

Adelbert Moot, George F. Brownell, and Herbert A. Taylor, for Erie R. Co., New York, S. & W. R. Co., New York, S. & W. Coal Co., Pennsylvania Coal Co., Hillside Coal & Iron Co., and Clarence Coal Co.

Before GRAY, BUFFINGTON, and LANNING, Circuit Judges.

GRAY, Circuit Judge. The proceedings in this case were begun by a petition in the nature of a bill in equity, filed June 12, 1907, on behalf of the United States, under section 4 of the act of Congress of July 2, 1890, commonly known as the "anti-trust act," against the defendants named above. Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3201). The petition invokes the jurisdiction of this court to prevent and restrain the alleged violation by the defendants of sections 1 and 2 of said act of Congress. The defendants are all alleged to be corporations duly created under the laws of the states of Pennsylvania, New York and New Jersey, respectively.

In its first paragraph, the petition alleges that the defendants, the Philadelphia & Reading Railway Company, the Lehigh Valley Railroad Company, the Delaware, Lackawanna & Western Railroad Company, the Central Railroad Company of New Jersey, the Erie Railroad Company, and the New York, Susquehanna & Western Railroad Company (called the defendant carriers when referred to collectively), are common carriers engaged in interstate transportation, particularly in the transportation of anthracite coal from the mines of Pennsylvania to the markets of that and other states. It alleges that the defendants, the Philadelphia & Reading Coal & Iron Company, the Lehigh Valley Coal Company, the Lehigh & Wilkes-Barre Coal Company, the Pennsylvania Coal Company, the Hillside Coal & Iron Company, and the New York, Susquehanna & Western Coal Company (called the defendant coal companies), own and operate anthracite coal mines in the state of Pennsylvania, and "buy, sell and otherwise deal in anthracite coal in the markets of the several states"; that the defendant, the Temple Iron Company, also owns and operates anthracite mines in the state of Pennsylvania; that the defendant, the Reading Company, is the holding corporation of the Reading System,

and holds the entire capital stock of the Philadelphia & Reading Railway Company and of the Philadelphia & Reading Coal & Iron Company, and a majority in interest of the capital stock of the Central Railroad Company of New Jersey.

In its second paragraph, it is alleged that, save the Pennsylvania Railroad Company and the New York, Ontario & Western Railroad Company, and the line of the Delaware & Hudson Company, the defendant carriers operate the only lines of railroad that penetrate the anthracite coal regions, and, with the exception stated, furnish and control the only means of transporting anthracite coal from the mines in Pennsylvania to the markets and distributing points in that and other states, particularly the great markets and distributing points at tide water in the vicinity of New York.

The third paragraph of the petition alleges that the Reading Company, the holding corporation of the Reading System, which holds the entire capital stock of the Philadelphia & Reading Railway Company, also holds the entire capital stock of the Philadelphia & Reading Coal & Iron Company; the Lehigh Valley Railroad Company owns all the capital stock of the Lehigh Valley Coal Company; the Central Railroad Company of New Jersey owns nine-tenths of the capital stock of the Lehigh & Wilkes-Barre Coal Company; the Erie Railroad Company owns all the capital stock of the Pennsylvania Coal Company and a large majority of the capital stock of the Hillside Coal & Iron Company; and the New York, Susquehanna & Western Railroad Company owns nearly all of the capital stock of the New York, Susquehanna & Western Coal Company; and that these so-called "subsidiary" coal mining companies (the defendant coal companies herein) are controlled by or in the interest of the defendant carriers, or some of them, through the ownership of controlling stock interests.

The fourth paragraph of the petition, after stating that anthracite coal is an article of prime necessity and universally used for domestic purposes throughout New England and the Middle Atlantic States, and that the source of the entire supply, save a few small deposits of inferior quality, is located in the state of Pennsylvania, in an area of about 484 square miles, divided for trade purposes into three regions, viz., the northern or Wyoming (sometimes called the Lackawanna) region, the middle or Lehigh region, and the southern or Schuykill region, alleges that the defendant carriers and the Reading Company, either directly or through the said defendant coal companies, own or control 90 per cent., approximately, of the entire unmined area of anthracite, distributed substantially in the following proportions, to wit:

|  | Per Cent. |
|---|---|
| Reading Company | 44.00 |
| Lehigh Valley Railroad Company | 16.87 |
| Delaware, Lackawanna & Western Railroad Co. | 6.55 |
| Central Railroad Company of New Jersey | 19.00 |
| Erie Railroad Company | 2.59 |
| New York, Susquehanna & Western Railroad Co. | .54 |
|  | 89.55 |

—and that they produce, either directly or through the agency of these coal companies, from 70 to 75 per cent., approximately, of the annual supply of anthracite. There are, however, it is alleged, a large number of independent individual firms and corporations who mine anthracite, either from their own properties or from properties leased by them, and who would be free from the control of the defendant carriers, were it not for the unlawful contracts hereinafter referred to; that these independent operators produce, approximately, from 20 to 25 per cent. of the annual supply of anthracite (the residue being produced by the anthracite carriers not parties hereto), which would come in competition in the great distributing centers with the anthracite produced by the defendant carriers, or their so-called agencies, the defendant coal companies, were it not for the unlawful contracts, combinations and conspiracies hereinafter charged and set forth, which stifle competition between the several defendant carriers, or their so-called agencies, in the sale of anthracite coal throughout the several states, and between such defendant carriers, or their so-called agencies, and the aforesaid independent operators.

Paragraph 5 alleges that that part of the anthracite output not consumed in the state of Pennsylvania, is carried chiefly to tide water at New York Harbor, and is thence distributed by water and by railroad to points in the New England and Middle Atlantic States; that New York Harbor is the principal distributing point for anthracite coal, and that the price in that market fixes or regulates its price in the markets of the several states which get their supply through New York Harbor points.

Paragraph 6 sets forth the attempted lease, in January, 1892, by the Lehigh Valley Railroad Company and by the Central Railroad Company of New Jersey, as lessors, of their respective railroads and coal properties, to the Philadelphia & Reading Railroad Company, predecessor of the present defendant, as lessee, for the period of 999 years; and that by the decree of the chancellor of the state of New Jersey, said lease of the properties of the Central Railroad Company was adjudged to be null and void, and that, in consequence thereof, the lease between the Philadelphia & Reading Railroad Company and the Lehigh Valley Railroad Company was rescinded.

The gist of the petition and its charging part are set forth in the seventh paragraph thereof. Its general charge of combination and conspiracy is thus set forth:

"The average price of anthracite coal at tide water, taking for illustration the stove size, which rose from $3.71 and $3.85 a ton in 1890 and 1891, respectively, prior to the leases just described, to $4.15 and $4.19 a ton in 1892 and 1893 respectively, the years during which the said leases were in force, again declined, under the influence of competition, in the years immediately following the cancellation of the leases, falling to $3.60 a ton in 1894 and $3.12 a ton in 1895. Whereupon, in violation of the provisions of sections 1 and 2, respectively, of an act of Congress, approved July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies" (26 Stat. 209), the defendant the Reading Company, and the defendant carriers and the defendant coal companies, owning or controlling 90 per cent., more or less, of all the anthracite deposits, and producing 75 per cent., more or less, of the annual anthracite supply, and controlling all the means of transportation between the anthracite mines and tide water, save the rail-

roads operated by the Pennsylvania Railroad Company and the New York, Ontario & Western Railway Company, which, as aforesaid, reach only a limited number of collieries, entered into an agreement, scheme, combination, or conspiracy, by virtue whereof they acquired the power to control, regulate, restrain, and monopolize, and have controlled, regulated, restrained and monopolized, not only the production of anthracite coal, but its transportation from the mines in Pennsylvania to market points in other states and its price and sale throughout the several states, with the result that competition in the transportation and sale of anthracite coal has been wholly suppressed, and the price thereof to consumers greatly enhanced. As steps in the development of this illegal combination, and in furtherance of its illegal purposes, the defendants herein named, or some of them, engaged in and became parties to the following additional acts, schemes and contracts, among others, in violation of the aforesaid act of July 2, 1890," etc.

These "additional acts, schemes and contracts," alleged to be steps in the development of this illegal combination, in violation of the act, are then set forth in said paragraph. They are four in number, and are referred to as (a) the 65 per cent. contracts, (b) the absorption by the Erie Railroad Company of the New York, Susquehanna & Western Railroad Company, (c) the acquisition by the Reading Company of the majority of the shares of the Central Railroad Company of New Jersey, (d) the Temple Iron Company transaction, and (e) the acquisition by the Erie Railroad Company, while controlling the Hillside Coal & Iron Company, of all the shares of the Delaware Valley & Kingston Railroad Company, a projected competing carrier, and all the shares of the Pennsylvania Coal Company, a competing producer.

All the above named defendants, both carrier and coal companies, have filed their answers to the petition, and the Hillside Coal & Iron Company demurred generally for want of equity, and specially for multifariousness. These answers are several and separate, and each of them denies any participation in any combination or conspiracy, as charged against all the defendants in the seventh paragraph of the petition, and all knowledge or information in regard to the same. The separate acts charged against various groups of the defendants, as steps towards the alleged general conspiracy, and as independently unlawful, are also denied by those defendants, respectively, against whom the charge is made.

After the filing of the answers, the petitioner, by leave of the court, amended its original petition, by adding as defendants therein a large number of independent coal producers, operators and mine owners, as being parties to the so-called 65 per cent. contracts with all or some of the original defendants.

Issue having been joined by replication duly filed by the petitioners, evidence was taken at great length on behalf of both the government and the defendants, and the case is now before us on final hearing.

The provisions of the act of Congress, of July 2, 1890, with which we are here concerned, are contained in sections 1, 2, and 4 of said act, and are as follows:

"Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof,

183 F.—28

shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"Sec. 2. Every person who shall monopolize, or combine. or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.
* * * * * * * * * * * * * *
"Sec. 4. The several Circuit Courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises."

The theory of the government's case, as stated by the learned and able counsel who represented it, is that all the original defendants have long been parties to a general combination and conspiracy which stifles competition and obstructs trade and commerce among the states in anthracite coal, to which the separate acts charged against various groups of the same defendants are referable as steps towards the common goal; and further, that these separate acts of the various groups are independently in violation of the act of Congress, and, contributing as they do to the same end, that all the defendants, parties to some of them, would properly be embraced in one petition, though there were no general combination or conspiracy to which each might be referred.

Counsel for the petitioner have dwelt at great length upon the somewhat peculiar conditions now and for a long time past obtaining in the production and transportation of coal in the anthracite region of Pennsylvania, and counsel for the defendants have referred to the history, as shown by the evidence, of the development of coal production and transportation in that region, and the necessary and fostering care exercised by the state in promoting that development. This development has necessarily been influenced by the peculiar natural features, topographical and geographical, which characterize the anthracite region, and it is doubtless true that the present situation of trade and traffic in anthracite coal is largely the outgrowth of these antecedent conditions.

The knowledge of the availability of anthracite coal as a fuel for domestic and industrial purposes, antedating as it did the railroad era, was not utilized for want of transportation facilities, and after the beginning of that era, for the want of capital for the building of railroads and the mining and preparation of the coal for use. The requirement of such capital was enhanced by the fact that the production of anthracite coal differed from that of bituminous coal, in that the former, after it was mined, required to be broken up before it was marketed into assorted sizes, by means of expensive machinery called "breakers."

The transportation of anthracite coal to the more distant markets of Pennsylvania and adjoining states, was at first accomplished by the construction of canals by those owning the coal properties. The public policy of the state of Pennsylvania, for obvious reasons, favored such construction. This public policy also extended to the construction of railroads from convenient shipping points to different parts of the anthracite region. This policy is exemplified by the acts of Assembly of the state of Pennsylvania, between the years 1823 and 1871, which expressly conferred upon the Delaware & Hudson Company the same authority which was conferred upon it in its act of incorporation in the state of New York, April 23, 1823 (Laws 1823, c. 238), "to construct a canal or water navigation from the anthracite coal district in Pennsylvania to the Hudson river in New York, to purchase lands in Pennsylvania containing stone or anthracite coal; and to employ its capital in the business of transporting to market coal mined from such lands." This authority was afterwards extended to the construction and acquisition of railroads for the same general purpose of transporting coal from the coal lands owned by said company. The same is in general true of the other defendant carriers. Under and in deference to the same general policy, the roads of the other defendant carriers were constructed, either by the present corporations or their predecessors in title, as also were established the defendant coal companies which grew up under the auspices or ownership of the defendant carriers, respectively, each coal company producing or marketing the coal over the railroad to which the mines from which it was produced were contiguous or naturally tributary. These coal companies were organized from time to time under acts of Assembly of the state of Pennsylvania, with authority to mine and sell coal and to acquire coal lands for that purpose. Moreover, by an act of Assembly of the state of Pennsylvania, approved April 15, 1869 (P. L. 31), entitled "An act to authorize railroad and canal companies to aid in the development of the coal, iron, lumber and other material interests of this commonwealth," such railroad and canal companies were authorized to aid corporations engaged in developing coal, iron, lumber, and other material interests of Pennsylvania, by the purchase of their capital stock and bonds, or either of them.

The anthracite coal deposits of Pennsylvania are found in three quite distinct and separate fields or regions—the upper, or Wyoming, region extending in a northeast and southwest direction, and of comparatively narrow width, for a distance of 50 or 60 miles, partly on both sides of the Susquehanna river as it runs from the northeast to the southwest, containing 176 square miles in Lackawanna and Luzerne counties; the middle or Lehigh region containing 127 square miles in Luzerne, Schuylkill, Columbia and Northumberland counties; and the southern or Schuylkill region, in Schuylkill, Dauphin and Carbon counties, containing 181 square miles. Scranton and Wilkes-Barre are the principal towns of the Wyoming region, Hazleton of the Lehigh region, and Pottsville of the Schuylkill region. In each of these regions, there are many collieries and plants for preparing coal, including those owned and operated by the defendant coal companies or carriers, as well as by so-called independent coal companies

and operators. Into each of them run one or more of the defendant carrier companies, which, with some other companies not defendants, collect and carry the coal adjacent to their lines, respectively, by means of the spurs and branches constructed from such lines to the various mines and collieries. Naturally, each railroad line carries the coal from that part of the coal region adjacent to it or conveniently reached by its spurs and branches.

From one of the tables filed as a government exhibit, we take the following statement of the shipments of anthracite coal carried by the defendant railway companies, and two others, as initial transportation lines during 1907, and the proportionate percentage of the whole carried by each:

| Railroad. | Gross Tons | Per Cent. |
|---|---|---|
| Phila. & Reading Ry. | 14,018,795 | 20.89 |
| Lehigh Valley Railroad | 11,532,255 | 17.18 |
| Central R. R. of New Jersey | 8,714,113 | 12.99 |
| Del. Lackawanna & West. R. R. | 10,237,419 | 15.25 |
| Delaware & Hudson Company | 6,562,768 | 9.78 |
| Pennsylvania Railroad | 6,203,271 | 9.24 |
| Erie Railroad | 7,151,683 | 10.66 |
| New York, Ontario & West. Ry. | 2,689,089 | 4.01 |
| | 67,109,393 | 100.00 |

It appears from the exhibits and testimony produced by the petitioner, that approximately 12 per cent. of the total production of coal in the anthracite region is not shipped away, but is consumed at local points and in the operation of the mines, and that, taking the year 1905 as a normal year, it would appear that, of the coal that was shipped away from the mines, about 25 per cent. was carried to tide water points in New York Harbor, and of the balance, about 20 per cent. was consumed within the state of Pennsylvania and 55 per cent. shipped to points outside the state, other than those at tide water in New York Harbor.

As averred in the petition, and as appears in the agreed statement of facts, the distribution of coal lands among the principal holders at the time of filing the petition was as follows:

| Names of Holders | Area Possessed Acres. |
|---|---|
| The Del.. Lackawanna & West. R. R. Co. | 17,353 |
| The Delaware & Hudson Co. and subsidiaries | 25,180 |
| Hillside Coal & Iron Company | 13,466 |
| The Pennsylvania Coal Company | 13,900 |
| The New York, Susquehanna & West. Coal Co. | 963 |
| Scranton Coal Company | 2,695 |
| Elk Hill Coal & Iron Company | 3,049 |
| Lehigh & Wilkes-Barre Coal Company | 15,650 |
| The Temple Iron Company and subsidiaries | 4,465 |
| Susquehanna Coal Co. and affiliated companies | 16,867 |
| Lehigh Valley Coal Company | 37,047 |
| Coxe Bros. & Company, Inc. | 5,311 |
| Philadelphia & Reading Coal and Iron Co. | 98,077 |
| Lehigh Coal & Navigation Company | 13,783 |
| Total | 267,806 |
| Total Coal Area (484 square miles) | 309,760 |

Of these, the Delaware & Hudson Company and its subsidiaries, the Scranton Coal Company, the Elk Hill Coal & Iron Company, the Susquehanna Coal Company and affiliated companies, and the Lehigh Coal & Navigation Company, whose ownership aggregates 61,574 acres, are not defendants in this proceeding, as participants in the general combination or conspiracy charged by the petition against the original defendants therein named. This would leave about two-thirds in area of the coal lands of the anthracite region in the ownership or possession by lease, or otherwise, of the defendant companies. As appears from the undisputed testimony of the defendants, these present holdings of coal lands have resulted from acquisitions made through a long period of years by the companies named respectively, or their predecessors in title, beginning, in the case of some of the largest holders and in respect to the larger part of the acquisition, long prior to 1874. The gradual growth of these acquisitions and the consequent development of the present situation, it is contended by the defendants, have been induced by natural causes, such as the geographical and topographical features of the anthracite coal region, which have presented serious obstacles to the construction of railroads with which it was sought to penetrate the different coal fields of the anthracite region, and which have enhanced enormously the cost of their construction; that in the earlier periods of the development of this region, when the mines and the production of coal were more largely in the hands of individuals and small corporations, the business of mining and marketing coal was wasteful and often resulted largely in the failure or bankruptcy of those concerned therein. The individual exploiter skimmed the cream, so to speak, of his coal lands, and, unable to meet the expense of practicing the economies necessary to their full development, the mines were not infrequently abandoned, and of this abandonment, deterioration or ruin was the natural result. That, latterly, the recurrence of strikes and labor troubles have contributed to the difficulties of the situation. That these strikes and labor troubles extended to all the coal mining and coal shipping operations of the whole region, affecting all producers, great and small alike, and that the solidarity of the labor unions compelled a joint agreement, embracing all engaged in mining operations as to the terms of settlement. That since the last settlement in 1902–03, there has resulted a condition of comparative industrial peace in the anthracite region. That this condition, together with the increased demand for and the consequent increased price of coal have regulated, without destroying, the natural competition of the great carrying and producing companies. That many economies in the production and sale of coal have been made possible, wasteful production largely done away with, and, more than all, a wise and scientific conservation of the future supply of this necessity of modern life has been brought about, to the infinite advantage of the public and of those connected with the production of coal, whether as capitalists or laborers.

It is further urged by the defendants, that the destruction of present conditions and methods attending the production and sale of coal,

will produce a deplorable anarchy in the trade, and involve in confusion and financial loss all those engaged therein, a confusion and loss by which the consumer is bound to suffer.

This may all be admitted. Counsel for the petitioner, indeed, do not undertake to deny, as it is unnecessary that they should, any of these statements. They are only pertinent as challenging by their importance the careful consideration by the court of the issues involved in the case before us.

The general situation being as thus briefly indicated, the defendant railway carriers and defendant coal companies are charged by the petition, as above stated, with having, in violation of the provisions of sections 1 and 2 of the act of Congress, approved July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies" at a time not definitely stated, but presumably shortly after the year 1895, "entered into an agreement, scheme, combination or conspiracy, by virtue whereof they acquired the power to control, regulate, restrain and monopolize, and have controlled, regulated, restrained and monopolized, not only the production of anthracite coal, but its transportation from the mines in Pennsylvania to market points in other states, and its price and sale throughout the several states, with the result that competition in the transportation and sale of anthracite coal has been wholly suppressed and the price thereof to consumers greatly enhanced." For specific details of time, place and circumstance of this somewhat vague and indefinite charge, we must of course look to the evidence adduced by the petitioner. In saying that the time fixed for the entering into the combination and conspiracy charged, is presumably shortly after 1895, reference is made to the statements of the petition introductory to the charge above quoted. These statements having set forth the attempted lease, in 1892, by which the Philadelphia & Reading Railroad Company, as lessee, was to take over the railroad and coal properties of the Lehigh Valley Railroad Company and of the Central Railroad Company of New Jersey, the lessors, for a period of 999 years, and that the same was set aside by a decree of the chancellor of the state of New Jersey, in 1893, at the suit of its Attorney General, adjudging the same to be null and void, the petition avers that the price of stove size of anthracite coal at tide water, which rose from $3.71 and $3.85 a ton in 1890 and 1891 respectively, prior to the leases just described, to $4.15 and $4.19 a ton in 1892 and 1893, respectively, and again declined in the years immediately following the cancellation of the leases to $3.60 a ton in 1894 and $3.12 a ton in 1895. "Whereupon," the petition charges that the defendants entered into the combination and conspiracy as above recited. The conclusion is thus sought to be drawn by the petitioner, that the motive of the combination and conspiracy about to be charged was the fall in the price of stove coal that occurred in 1895, and that the time at which it was entered into was shortly thereafter.

Accordingly, as being direct evidence of the general conspiracy charged, we are referred to the testimony touching what is alleged to be an express agreement or arrangement entered into between the

presidents of the defendant carriers, on January 23, 1896, and spoken of as "the presidents' percentages."

Joseph A. Harris, one of the first witnesses produced on behalf of the petitioner, was president of the Philadelphia & Reading Railroad Company from 1893 to 1895, when he became one of the receivers appointed by this court of the said railroad, and of the coal and iron company, and after the reorganization in 1897, president again of the Reading Railroad Company, the Reading Company, and the Reading Coal & Iron Company, until 1901, when he retired. He was called to testify, and was questioned at great length as to certain alleged agreements between the defendant carriers and coal companies in 1876, 1884, 1885 and 1886, by which the coal tonnage of the different roads was to be apportioned among the several roads and restricted to certain percentages of the whole. To repeated questions, he answered that he had no recollection at all in regard to such agreements ever having existed. He was then questioned as to certain testimony given by him in a suit by the state of Pennsylvania against certain of these companies in 1886, as to all of which he replied that he had no recollection of having given the testimony referred to, and when read to him, that it did not refresh his memory. The same course was pursued in regard to the proceeding before the Interstate Commerce Commission, in which he is said to have testified with the same result. This course of questioning was pursued, and to reiterated leading questions, he repeatedly declared that he had no recollection and did not believe that any such agreements between the defendant companies as he was being interrogated about had ever existed. The examination then continues as follows:

"Q. Coming now to the year 1896, while you were president of the Philadelphia & Reading Railroad Company, give us the substance of the agreement between the presidents of the anthracite coal roads entered into at that time, establishing what were thereafter commonly called 'presidents' percentages.'

"A. I do not know anything about it.

"Q. Have you never heard of the 'presidents' percentages'?

"A. I have never heard of the 'presidents' percentages.' I never heard the term.

"Q. What was the agreement entered into by the presidents of the railroads in 1896, in reference to allotting to each interest a certain percentage of the total output of coal?

"A. I do not know. I do not remember that there was any agreement at all. Have you anything there to refresh my memory?

"Q. In 1896, was there not a meeting of the presidents of the coal carrying roads, in which the question of the allotment of tonnage was discussed?

"A. That I do not remember at all.

"Q. Do you remember no discussion in reference to that matter between the presidents of the various coal carrying roads?

"A. No; if you will give me the papers, I will look over them and tell you.

"Q. This is your testimony which was taken in the investigation before the Interstate Commerce Commission (referring to testimony).

"A. I no doubt gave my testimony correctly then.

"Q. You were asked: 'You do recollect, do you not, that there was a time when that matter (referring to the distribution of tonnage among the coal carrying roads) came up for discussion among the presidents of the coal carrying roads?' and you replied, 'What question came up? Q. The question of the division of the business of carrying coal—the question of the division

of the anthracite coal into certain percentages?' you saying, 'Understanding as to what share of the business each road was legally entitled to? Q. Yes, if that makes it clearer,' and then you answered that, 'Yes.'

"Judge Campbell:

"I think the witness's attention should be called to the whole of his examination and cross-examination, because he may have, and probably did on further recollection or refreshment of his memory, made a very material change in the substance of his testimony.

"By Mr. McReynolds:

"Q. Have you any recollection of those meetings at all?

"A. I have no recollection of them at all; no. If I were to see these minutes or to read them, I might remember them. I have no doubt that what I testified to there was true. That is all I can say.

"Q. From 1896 down to the time when you left the Reading Railroad Company, was there not a general understanding between you and the various presidents of the coal carrying roads, as to what percentage each one should be entitled to?

"A. There was not a general understanding, because it was the subject of a great deal of contest. I do not believe, so far as my recollection goes, that there was ever any agreement made at all.

"Q. Please read this testimony that you gave before the Interstate Commerce Commission in 1903, commencing on page 1570, for three or four pages, and see if it refreshes your recollection on that subject.

"A. (After reading testimony) I notice I said then, as I say now, that it was too far away for me to recollect any of the details of that meeting. It has been long years since, and my memory has not been refreshed. I think this testimony of mine, from page 1572 to page 1575, is all correct.

"Q. Having read that, do you not remember that there was a meeting in the year 1896?

"A. I only remember it by these papers.

"Q. Having refreshed your recollection about that, do you not remember that there was a meeting in the year 1896 of the presidents of the anthracite coal carrying roads, at which they came to a general understanding about the amount of the proportion of the total output which should be allotted to each?

"A. Yes.

"Q. What was the percentage at that time allotted to the Philadelphia and Reading interest?

"A. Twenty and a half, it appears from this testimony.

"Q. And each of the other roads had some percentage of a similar character allotted to them?

"A. Yes; I say here in this testimony, 'there was never any binding agreement'—I thought there was not—'as can best be shown by the statistics at that time. There never was a year when that understanding was kept or nearly kept, and as a general statement of what would be fair and reasonable, there was never a single year when there was an approach to it.' There is a general statement, and that is correct.

"Q. There was, however, a general understanding among the parties, that they should each endeavor to produce a given percentage which was allotted?

"A. Yes, sir."

(See Record, vol. 2, pp. 25, 26.)

Mr. Harris is a gentleman highly respected in the community in which he lives, but the activities of his useful life have long since ceased. He is pressed again and again with questions, the answers to which only disclose a want of recollection as to the matters suggested therein. His testimony, as quoted above, in regard to the so-called "presidents' percentages," falls short of supporting the general conspiracy charged in the petition, not only on account of the manifest infirmity of the witness's memory, but also on account of the substance of the testimony itself.

A copy of the testimony of one Alfred Walter, who at one time was president of the Lehigh Valley Railroad Company, given in a proceeding against some of these same defendants before the Interstate Commerce Commission, begun in 1902 on the petition of William R. Hearst, and certified before the secretary of said Commission, has been introduced into this case by the petitioner. Mr. Walter's deposition is an exceedingly long one. That part of it to which we are especially referred by counsel for the petitioner, is as follows (see Government Exhibit No. 159, vol. 3, Record, p. 377):

"Mr. Shearn: Have you not stated and is it not a fact, Mr. Walter, that the Lehigh Valley Coal Company during your administration did not produce and sell to tide water as much coal as it was capable of producing and marketing?

"Mr. Walter: I do not think I said anything like that.

"Mr. Shearn: Well, you used to receive Ruley's report, did you not?

"Mr. Walter: Yes.

"Mr. Shearn: And you used to see on those reports the heading, 'tonnage based on the presidents' percentages,' did you not?

"Mr. Walter: Yes.

"Mr. Shearn: What did that mean to you?

"Mr. Walter: That meant the question of the shipping of coal and not the sale of coal. You have the two mixed.

"Mr. Shearn: Changing the form of the question, then, was there during this period an understood arrangement between the presidents of the different companies as to the proportion of anthracite tonnage to be shipped over each of the railroads?

"Mr. Walter: Yes.

"Mr. Shearn: And when was that understanding arrived at; when was it reached?

"Mr. Walter: Oh, I do not remember.

"Mr. Shearn: Was that not in January, 1896?

"Mr. Walter: I think it was; yes. I think so."

Afterwards, on cross-examination, however, he testified as follows:

"Mr. Gowen: You have just spoken of these figures that were called the 'presidents' figures,' having to do with the relative tonnage over various roads, and you spoke of the matter as having originated in 1896. At that time, you had no connection with the Lehigh Valley road?

"Mr. Walter: No.

"Mr. Gowen: You do not know anything about how the figures started?

"Mr. Walter: I was not president of the Lehigh Valley at that time.

"Mr. Gowen: You had nothing to do with the coal business at that time?

"Mr. Walter: No.

"Mr. Gowen: During the time you were president of the Lehigh Valley Railroad Company, you were under no agreement or understanding which was binding on you, by which you undertook to regulate the percentage of shipments over the Lehigh Valley road? You could have decreased your percentage or run it up without violating any agreement?

"Mr. Walter: Yes, sir."

The natural inference to be drawn from Mr. Walter's testimony, as well as that to be drawn from Mr. Harris's testimony, would seem to be that, for some time prior to January, 1896, as well as for some time thereafter, there had come to be what was generally thought a normal coal tonnage over the railroads respectively transporting anthracite coal, representing the capacity of the collieries in the regions tributary to those roads respectively, as derived from the reports of the Bureau of Statistics furnished to the railroad and coal companies

and the public generally. It would also seem from Mr. Ruley's testimony, as above quoted, that these supposititious percentages, which the so-called "presidents' percentages" of 1896 had by that time come to be, were not reported until January, 1901, in the monthly reports of the Bureau of Statistics, and were discontinued in May, 1903. Nor is it to be inferred, as it seems to be by the counsel for the petitioner, on page 57 of their brief, that immediately after the meeting of 1896, and not before, all the coal interests "reported to a common source their production and sale of coal"—that is, to the Ruley Bureau of Statistics. . On the contrary, Mr. Ruley's testimony shows that from 1890, when he took charge of the Bureau, these reports had been regularly made of the tonnage carried by the roads respectively, as well as of the sales of coal and prices obtained by the various shippers.

The objection to the admission of the copy of Mr. Walter's testimony, as taken before the Interstate Commerce Commission, must be sustained. It is testimony taken before a body not judicial but administrative, in a proceeding between different parties, and with reference to nonidentical issues. It is not authenticated or proven by any witness present at the time the testimony was taken. It is therefore not within the rules permitting the testimony of a witness taken in one proceeding to be used in another. The inclusion of this testimony in the record is to be regretted, as it is embarrassing to the court in considering the weight and effect of all the testimony on either side. It may be said that the testimony, as far as its substance goes, is in the same line with the other testimony on the part of the petitioner; but the barriers between what is competent and incompetent as testimony, cannot be broken down without creating confusion and exposing litigants to dangers from which they have a right to be protected.

The testimony of Mr. Ruley, of the Statistical Bureau, in respect to the so-called "presidents' percentages," is also referred to in support of the general conspiracy charge. This Bureau was started by one Jones, in 1876, as a private enterprise in industrial statistics, and he sold his compilations, among others, to the defendant carriers, individually. In 1892, he sold out his business to Ruley, who has since carried it on, and whose work has been, and is now, recognized as authoritative by those interested in industrial statistics. It is no doubt true that his patronage or employment has come largely from the defendant carriers and defendant coal companies, who are more than any others interested in these statistics, and indeed, since 1902 and perhaps before, they seem to have been compiled in great part from the monthly returns made to the Bureau by the defendant coal companies and the defendant carriers, severally, of the sales and shipments over the respective roads, and the price obtained for the different sizes of coal at tide water in New York Harbor. Mr. Ruley testifies that these compilations have been furnished each month to the press—that is, to the coal trade journals—and thus find their way to the office of every considerable wholesale or retail dealer in anthracite coal. He testifies that they are also furnished to the departments of the general and state governments. After the award made by the Anthracite Coal Strike Commission, in April, 1903, by which all the

defendant companies and other coal operators in the anthracite region, by agreement previously made among themselves, were jointly and severally bound, it became necessary, in order to carry out the award of the Commission, as to the sliding scale of wages fixed thereunder, to resort to the monthly compilations of this Statistical Bureau, in regard to average prices for certain grades of coal at tide water in New York Harbor.

From Mr. Ruley's testimony, it appears that the appellation "presidents' percentages" originated in one of the trade journals to which Mr. Ruley had contributed monthly tonnage reports. In his cross-examination, page 99, volume 2 of the record, we find the following:

"Q. You said the other day that you got the 'presidents' percentages' from the press, if I understood you correctly, or trade papers?

"A. I said they were published there, *and that is the only source of information I had in mind.*"

(The italics are ours.)

"Q. Did you ever talk with any president about the thing, one way or the other?

"A. No, sir."

He then refers to a Coal Trade Journal which had been published for 35 years by Mr. Saward, and in connection with this Trade Journal was a Coal Trade Annual, published by the same person. He said he had them with him as far back as 1890. Referring to the Annual of 1890, he is asked:

"Q. I find below, on page 11, 'Reducing the business done by each of the initial anthracite coal carriers to the basis of percentages, one may find that there are some interesting features attached thereto. Taking the years 1886–1888 (the latter being the latest official figures available) one finds that the Reading Company did an average of 20.55 per cent., the Lehigh Valley 17.78 per cent., the Central Railroad of New Jersey 14.91 per cent., the Delaware, Lackawanna & Western 17.36 per cent., the Delaware & Hudson 11.29 per cent., the Pennsylvania Railroad 11.22 per cent., the Pennsylvania Coal Company 4.55 per cent. and the Erie 2.27 per cent.; this fairly represents the "ability to produce" of the several interests on collieries tributary thereto, whether the total output be 40,000,000 of tons annually or less.' Are you able to find anything earlier than that in any publication on the percentage basis?

"A. I judge I could.

"Q. That is the earliest you did find?

"A. The earliest I could find in the files.

"Q. In other words, for a long time the statisticians had been dealing with tonnages on the percentage basis?

"A. Yes.

"Q. What is the next one you have?

"A. 1891. In 1896 there is quite an extensive report.

"Q. Is this report of 1896 one of the reports you had in mind the other day when you spoke of these presidents' percentages being published?

"A. Yes, sir. * * *

"Q. Without giving the monthly production and the shipments by the anthracite companies, and the production in each district, with its percentages, and the actual percentages of the whole shipments for the years 1890 to 1895, each year separately for the P. and R., the L. V., the C. R. R. of N. J., the D. L. & W., the D. & H., the P. R. R., the P. C. Co., the Erie, the O. & W., and the D. S. & S., on page 21—are these figures which you furnished originally to these publications yourself?

"A. Yes.

"Q. You recognize these figures?

"A. I do not say I furnished the per cents. I furnished the tonnages on which the percentages are based.

"Q. I find this statement, 'There was held on the 23d of January, 1896, a meeting of the representatives of the several anthracite producing and carrying companies in order to come to some agreement in regard to trade conditions and its improvement. According to the figures presented at the meeting the tonnage of the different companies in 1895, as compared with 1894, is as follows: Then follows the statements of the companies and the production for 1895, and the per cent. for 1894, and the changes of increase or decrease in percentages, the largest being a change of 1.45 per cent. This was referred to a committee to adjust, which a week later brought in a report recommending that for the period commencing February 1, 1896, and ending March 31, 1897, the following percentages should be adopted: Philadelphia & Reading 20.50, Lehigh Valley 15.65, Delaware, Lackawanna & Western 13.35, Central Railroad of New Jersey 11.70, Pennsylvania Railroad 11.40, Delaware & Hudson Canal Company 9.60, Erie Railroad 4, Pennsylvania Coal Company 4, Delaware, Susquehanna & Western 3.20, New York, Ontario & Western 3.10.' Now are these percentages and these statements the percentages and statements you had in mind about seeing them in print in the trade journals?

"A. Yes.

"Q. Do you know of any earlier publication of the presidents' percentages, except in the journal of which this is a compilation?

"A. No, sir; I do not.

"Q. And was it from these sources, or the original journal of which this is a compilation, from which you got the compilation from which you made your percentage reports and figures?

"A. Yes."

He afterwards testifies that ever since he had been connected with the Bureau, since 1890, these journals have been giving the details of the anthracite coal statistics, the details for the month and the details for each company, together with circular prices of the different companies for each grade of coal. So that it appears that the only knowledge that Mr. Ruley had of a meeting on the 23d of January, or of any meeting was the publication in the trade journal above quoted. As to the statement made in this publication, it is to be observed that the so-called agreement as to percentages of coal traffic to be distributed among the carrier companies, was to obtain for the period commencing February 1, 1896, and ending March 31, 1897, and that these percentages correspond very nearly with those reported in the same trade journal for the years 1886–1888. Counsel for the government rely upon Mr. Harris's testimony, that the understanding, such as it was, continued in force as long as he remained president of the Philadelphia & Reading. We do not think Mr. Harris's testimony, taken as a whole, will bear out this statement. Counsel also rely upon the fact that the reports of the Bureau of Anthracite Coal Statistics from January, 1901, to May, 1903, show a calculation of tonnages as they would be if based on the so-called presidents' percentages. Referring to government Exhibit No. 7, produced by Mr. Ruley as showing the form of these reports, we do not find that these percentages are spoken of as presidents' percentages at all, though they undoubtedly correspond with what were reported as having been adopted in the meeting of January 23, 1896, in the trade journal above referred to. Mr. Ruley's explanation of how they came to be included in his report, for what purpose, why he abandoned them

after May, 1903, and that he had no direction from any defendant to so include them, we think deprives their inclusion during the period mentioned of any evidential value, as claimed by the petitioner. In considering the question, whether the matter of the so-called presidents' percentages furnishes any foundation for the general charge of combination and conspiracy in restraint of trade, as set forth in the petition, we must consider also the testimony of the defendants.

Mr. E. B. Thomas, president of the Lehigh Valley Railroad Company, testifies, first as to the general charge of the petition above referred to, as follows. The general charge having been read to him from the petition, he is asked:

"Q. Is that charge true or false?

"A. It is not true.

"Q. Did you ever have any knowledge of any such scheme as that which is charged?

"A. I never did.

"Q. Has there ever been any such agreement or scheme, or combination, or conspiracy between the defendants?

"A. Never has. I have never known the time when every party in the trade was not at liberty to produce and transport all the coal he desired to, or that he could sell. If he could not sell it, he could throw it in the North River, if he wanted to.

"Q. Did that agreement, or any such agreement as that, or any agreement of that character, exist at the time charged in the complaint, or at the time of the commencement of this proceeding, June 12, 1907?

"A. I never knew of any."

Coming to the question that the general conspiracy, as charged, was begun about the time of or at its origin in the arrangement of the so-called "presidents' percentages," on January 23, 1896, Mr. Thomas's testimony is as follows:

"Q. Some testimony has been offered by the complainant about a meeting, or some meetings, which were held in or about 1896, of the presidents of the anthracite railroads, at which there was an understanding, or an attempt at an understanding, between them as to percentages of product of anthracite coal to be carried by different railroads during that year. Were you present at any such meeting at that time?

"A. Yes. I was present at a meeting where there was an attempt made to reach a tentative understanding as to the quantity of coal, proportion of coal, that each road would transport. It related entirely to transportation.

"Q. For how long a period was that under discussion? I mean, what was to be the period—

"A. The period was to be a year. There was not enough percentage in a hundred to go around, to begin with.

"Q. What do you mean by that?

"A. I mean to divide it into per cents., we had to put one hundred and one per cents. as near as we could come.

"Q. In other words, there was some party or parties that were there that would not consent to the percentage that was talked about; is that right?

"A. That is right.

"Q. And never did consent?

"A. Never did consent to it. As far as I have any knowledge, I do not think anybody ever regarded it. It came about by reason of crowded terminals, the question of distribution of cars among shippers.

"Q. I wish you would explain that more fully.

"A. The individual operators claimed that, in times of scarcity of cars, we were favoring our own companies, or those controlled by the railroads, and that they were short of cars. There was an attempt to distribute the tonnage to be handled on colliery production. The individual shippers would

load up the cars and send them to tide water or to any other destination and allow them to accumulate and have no market for them. They crowded our terminals and then, when times came up that our own companies had not done the same, they claimed their same proportion of cars right along; and it was an endeavor to conduct the distribution of cars and movement of tonnage in a more orderly manner and in a more businesslike manner than it had previously been.

"Q. And to meet these complaints?

"A. To meet these complaints.

"Q. And to enable the railroad companies to meet these complaints?

"A. Precisely.

"Q. Was any demand made at that time, or was any suggestion of any demand made, to curtail the output of coal?

"A. None whatever. I recollect George B. Roberts, who represented the Pennsylvania at that meeting, stating distinctly that he would not discuss any question of that kind or have anything to do with it; with which I heartily accorded. * * *

"Q. The percentages which were considered at that time were the percentages which have sometimes been referred to in this testimony as the 'presidents' percentages'?

"A. I assume that they were.

"Q. Did that understanding or talk ever go into effect as an agreement?

"A. Never.

"Q. Was it ever put into operation?

"A. I think some people tried to live up to it a little while, until they found the other fellow was not.

"Q. Was there ever any talk about continuing it after the first year?

"A. Never.

"Q. By anybody?

"A. There never was any meeting held after the first one, and I do not think there were any practical results out of that.

"Q. Has there at any time since, except as to this early attempt by some of them, been any observation by the companies of these percentages which were adopted at that time?

"A. Not to my knowledge.

"Q. Has the Lehigh Valley Company ever observed them?

"A. It has not."

Elsewhere, in speaking of these so-called "percentages," he says: "I do not think that tentative understanding entered into ever had any practical result." He speaks of it repeatedly as an abortive attempt on the part of the carriers to prevent congestion of cars at the water terminals and docks, and to regulate the distribution of cars at the collieries. He says, during the course of his testimony above quoted, that it was directed against a usage of the independent operators to load up long trains of cars, and to use the same to store up coal mined in advance of demand, but that whatever the purpose of the same was, it was not lived up to even for the year during which it was to be tried.

William Truesdale, another witness called by the defendants, at the time of testifying had been president of the Delaware, Lackawanna & Western Railroad Company since March 1, 1889. In the course of his examination, he testifies as follows:

"Q. What is meant by presidents' percentages?

"A. I do not believe I am familiar enough with that matter to give any explanation of it. It is something that was arranged long prior to my connection with the Lackawanna Road, which had nothing to do with our affairs since then, if it ever had.

"Q. Did you ever enter into any agreement with any other person whereby the tonnage of the different coal carrying railroads was distributed according to certain arbitrary percentages?

"A. There was never such an agreement that I recollect of since my connection with the Lackawanna Railroad.

"Q. Has there been any distribution of tonnage according to any percentage?

"A. There has not.

"Q. Do you know what the alleged presidents' percentages are?

"A. I know what is referred to by that.

"Q. The Delaware, Lackawanna & Western's percentage, I believe, is said to be—

"A. Thirteen and thirty-five one-hundredths per cent. under those old percentages.

"Q. State whether or not the Delaware, Lackawanna & Western tonnage, since your connection with the railroad, has been maintained at about thirteen and thirty-five one-hundredths per cent?

"A. No, sir. I think nearly every year we exceed that very much.

"Q. State whether or not, since your connection with the Delaware, Lackawanna & Western Railroad, you have produced all the coal that you could profitably sell?

"A. We certainly have, and most of the time we operate our collieries to the limit of their capacity. * * *

"Q. And you have sold that coal at the best price you could obtain for it?

"A. We have."

W. A. Lathrop, a witness produced by the petitioner, had been in charge of the mines of the Lehigh Valley Coal Company between 1889 and 1901, and president of the Lehigh Coal & Navigation Company since March, 1907. In the course of his examination, he testifies as follows:

"Q. Are the collieries of your company operated to their capacity throughout the year, and have they been since your connection with it?

"A. Practically so. There are times during the summer when that is not done, because we cannot find the people to buy our coal. Except that, they are worked practically full time.

"Q. What proportion of the entire production of anthracite does your company put out?

"A. I think the total production last year was about 67,000,000, as near as I remember, and our production was not quite 3,000,000. That would be about 5 per cent., a little less than 5 per cent.

"Q. Do you endeavor to so operate your mines as to produce about that per cent. from month to month of the entire output?

"A. No, sir; we do not pay any attention to that.

"Q. You pay no attention to the output of the other companies?

"A. We get out all the coal we can find customers for. We would be glad to get out more if we could find them."

Mr. George F. Baer, who testifies that he has long been familiar with the affairs of the predecessors of the present defendants, the Reading Company, the Reading Railway Company, and the Reading Coal & Iron Company, as counsel for and director in the same, in 1901 became president of the defendant companies above named. After stating that the Philadelphia & Reading Railway Company is not a competitor for the carriage of coal, which originates in the northern or Wyoming region and the Lehigh or middle region, and that the operations and holdings of the Philadelphia & Reading Coal & Iron Company are confined entirely to what is known as the lower and Schuylkill region, testifies as follows:

"Q. Was there ever at any time, or is there now, anything in the nature of a division agreed upon or participated in by these defendants, of the tonnage carried by them?

"A. None whatever. There is absolutely no division of coal tonnage and has not been to my knowledge during the period since my active connection with the systems. During my administration, of which I can speak absolutely, there never was any division or attempted division of coal tonnage. We mine and market all the coal we can, without regard to what other companies are doing. It is as free and open a market, so far as that goes, as exists in any commodity in the world."

Taken in connection with the defendants' testimony, above quoted, it is not without significance too, that tables, filed as exhibits by the government, of the tonnages of the different defendant carriers after 1896, are utterly inconsistent with the existence of any pooling agreement. We take the following analysis of certain of these tables from the brief of the Lehigh Valley Railroad & Coal Companies. Taking the government's specimen report (Exhibit 7, vol. 3, p. 34) for the five months of 1903, it appears that over 1,500,000 tons, on which the freight at an average of $1.24 per ton, amounted to about $1,860,000, was carried by some railroads in excess of their allotments, provided the pooling agreement existed at that time. The want of conformity by the defendant carriers and others to the so-called "presidents' percentages," from 1896 to 1908, is more comprehensively shown in the table furnished by the Erie Exhibit No. 16, vol. 6, p. 455, exhibiting the yearly percentages of shipments of anthracite coal by the several transporting companies, from 1892 to 1908, inclusive.

Taking from this table only the figures for the years 1896 to 1908, they show that some railroads carried tonnage greatly in excess and others as much short of the tonnages allowable under the supposed pooling agreement, to wit:

|                    | Tons Over.  | Tons Under. |
|--------------------|-------------|-------------|
| Reading            |             | 2,490.892   |
| Lehigh Valley      |             | 1,705,015   |
| Jersey Central     | 3,241,078   |             |
| D., L. & W.        | 10,730,454  |             |
| D. & H.            |             | 934,132     |
| Penna.             | 12,185,542  |             |
| Erie               |             | 1,570,357   |
| O. & W.            | 7,069,496   |             |
| D. S. & S.         |             | 2,150,094   |
|                    | 22,041,028  |             |

That is to say, the three railroads, Jersey Central, Lackawanna, and Ontario & Western, violated the agreement, if it existed, by carrying over 22,000,000 tons more than they had right by the agreement to do. The earnings on this tonnage, at an average rate of $1.24 per ton (see vol. 2, p. 690) would have been $27,280,000, which represents approximately the amount that these three railroads obtained in earnings in excess of their right under the agreement, if it existed, and there is no evidence that any complaint was ever made by any of the companies on this account.

We are compelled to conclude that thus far the direct evidence relied upon by the government to show that all the before mentioned defendants have long been parties to a general combination and con-

spiracy, commencing presumably in 1896 and continuing down to the filing of the petition, which stifles competition and obstructs trade and commerce among the states in anthracite coal, fails to establish that charge, and we turn now to a consideration of what may be called the indirect testimony adduced, from which it is contended the existence of such general conspiracy must be inferred. In this respect, we are called upon chiefly to consider the acts charged in the seventh paragraph of the petition to have been committed by certain groups of the defendants in development of this illegal combination, and in furtherance of its illegal purpose, of which we have already given a summary.

The first of these has relation to the so-called 65 per cent. contracts. Much testimony has been taken on both sides in explanation of these contracts, which must be examined, in order to determine their character. It appears that, long prior to 1890, it had become a custom more or less prevalent in the anthracite region, for the smaller operators of collieries to sell the product of their mines to the large coal companies producing and shipping coal in their neighborhood, f. o. b. on the railroad to which their mines and territory were contiguous and naturally tributary. The terms on which these sales were made gradually came to be common to all parties so engaged; that is to say, instead of a fixed money price per ton, it was agreed that the small producer or independent operator who delivered his coal f. o. b. on the cars, should receive a certain per cent. of the average price at which that grade of coal was sold during the month in the tide-water market of New York Harbor. Out of the balance over such percentage must come the freight of the carrying company, and whatever profit there might be for the purchasing coal company. The advantages of such sales to the independent and smaller operators were stated by many witnesses of that class. To have marketed their own coal would have required sales agents and the maintenance of officers at the various market points, and would have entailed the cost of insurance and the risk of collections, and not infrequently the cost of storage, upon the seller. All this was avoided by the contracts in question, and the seller, upon delivery of the coal upon the cars, was done with it and received each month from a responsible buyer the price of his coal, as determined by the contract. There is no doubt from the evidence that this method of dealing between the large companies and the smaller operators grew in favor with both parties to the contracts. The large purchasing companies being compelled to maintain sales agents and offices at the market points and provide for insurance or storage, if needed, were put to little additional expense in caring for and disposing of the coal thus purchased. There is no evidence to show that this custom had its origin and subsequent growth in any agreement or concerted scheme on the part of the defendant carriers or coal companies, or others in the business.

The testimony of the operators called by the government, and occupying a large space in the record, shows that this custom had commenced back as far as 1860, one of them saying that they were educated to it from the first, by reason of the difficulty of getting cars

183 F.—29

and transportation just when they wanted it, to meet sales, but they all say that the principal reasons were those above enumerated—the expense of maintaining selling agencies and offices, risk of handling, and expense of storage, as contrasted with the regularity and certainty of payment secured by the method of selling f. o. b. to the large companies.

The rate of these percentage contracts was at first as low as 40 or 45 per cent. This percentage rose gradually to 55 per cent. About 1890, and for some time prior thereto, there had been some dissatisfaction expressed by the selling operators with the returns coming to them under these contracts. This dissatisfaction culminated in 1892, in an arrangement by which certain of the coal companies in the Wyoming region offered to take the product of the mines of the independent operators contiguous and tributary to certain of the railroads, on a 60 per cent. basis. This seems to have been the result largely of negotiations had with Simpson & Watkins, large colliery owners of that region. (See testimony of Clarence D. Simpson, Record, vol. 2, p. 440 et seq.) Simpson had insisted on 65 per cent., but 60 per cent. was finally agreed upon. This percentage seems to have been adopted by all the other coal companies and coal roads; whether by any concert or agreement among them, does not appear. This rate generally obtained until about 1899, when demands were made by some of the independent operators, whose contracts had expired or were about to do so, for an increase in the percentage prices to 65 per cent. Negotiations between the representatives of the independent operators and the coal companies and railroads were carried on for some time, without result, when early in the fall of 1900, a general strike of the coal miners and laborers of the whole anthracite region took place, resulting in an entire cessation of the production of anthracite coal.

There is some conflict in the testimony and in the contentions of counsel, as to the influences which brought about, on the part of the large coal companies and coal carrying roads, an acquiescence in this demand for 65 per cent. contracts. We think, however, it is established by the clear preponderance of the testimony that, during the autumn of 1900, those controlling the large coal companies and railroads affected by the strike, were induced to concede to the striking miners a 10 per cent. increase in their wages; that though this was agreed to on the part of the representatives of these companies, the smaller and independent operators were unwilling to accede to this increase, on the ground that it would necessitate the production of coal by them at a loss. As the strike extended over the whole anthracite region, and affected all producers of coal alike, the representatives of the striking miners refused to accept the settlement on the basis of this increase, unless agreed to by practically all the producers and operators throughout the region.

The proposed settlement having been thus brought to a standstill, conferences took place between representatives of the large coal producing companies and these dissentient operators—notably with those who had been parties to the expired 60 per cent. contracts, with the result that it was agreed that new contracts should be framed and

entered into, by which 65 per cent. of tide water prices should be given by the purchasing companies, instead of the 60 per cent. of the price obtained at tide water under the former contracts, in consideration of the entire output of the mines of the contracting operators, without limitation as to time, "shipments to be made from time to time as called for by the buyer." On these terms, such operators were to join in the settlement of the strike on the basis of a 10 per cent. increase in wages. Pursuant to this agreement, a form of contract, embodying its terms, was drawn up, which was presumably acceptable to all parties. At all events, contracts substantially in this form were thereafter, from time to time, executed severally between the theretofore purchasing coal companies and many of such so-called independent miners as produced their coal in territory contiguous and tributary to the roads over which the purchasing companies shipped their coal. These contracts provided that:

> "The general average f. o. b. prices herein referred to shall be determined by a disinterested expert accountant, satisfactory to both parties, to whom the buyer shall furnish, not later than the 8th of each month, a statement of the quantity of each size sold during the preceding month, and the amount realized therefor by the buyer at tide on all sales of each size of coal from the ...... region, and the accountant each month shall make a true average price for each size sold at tide of all the coal sold from the same region, and the average prices thus obtained shall be furnished by the accountant to the buyer and seller."

The expert accountant selected to make these returns was, naturally, Mr. Ruley, of the Statistical Bureau, who had since 1890 been furnishing these same statistics to the coal producing companies and all others interested.

Counsel for the government argue from the fact that these accounts were so rendered to the parties interested, that there must have been some concert or agreement in violation of the act of Congress among the defendants and others, with reference thereto. We cannot so regard it. It is, of course, possible that the information obtained from these monthly reports of the Statistical Agency or Bureau maintained by Mr. Ruley and his predecessor, might have been of some use to such a combination as is charged in the bill, to maintain rates of freight or prices of coal in the anthracite region, but, in the absence of any direct proof of such a combination, it is a very violent presumption, indeed, that, because of the existence of such statistics and monthly reports, published in all the trade journals of the country and in the hands of every retailer of coal, as well as in those of every producer of coal, there must have been such an illegal combination; and this too, in face of the fact that many obviously legitimate and useful purposes were to be subserved by such publications, to which all intelligent persons interested in the conduct of the business of producing, selling, carrying and consuming coal would, for their own information and advantage, refer. There does not seem to be the slightest direct proof, apart from the presumption we are asked to indulge in, of any illegal combination or contract promoted by the use of these statistics. The reports were public, and there is not the slightest intimation of any secret correspondence between the Statistical Bureau and the defendants. This information,

open to every one, was doubtless useful in many legitimate ways to those who subscribed for and supported it. We might as well be asked to draw unfavorable inferences, in the absence of other proof, from the use by the defendants of the statistics published by the state or federal governments, concerning mining operations and the coal supply of the country.

The genesis of these contracts being found in the long-established custom above described, the general raising of the percentage of price at tide water to be given to the individual seller, incident to the settlement of the strike, and the insistence by the so-called independent operators, whose previous contracts had expired, is not to be considered as necessarily predicated on any concert or agreement denounced by the act. Moreover, these contracts were clearly intrastate and not interstate in their character. They were complete when the coal was delivered at the mines f. o. b. to the buyer. They did not control or affect, except indirectly and incidentally, interstate commerce; much less did they suppress or restrain such commerce. No stipulation of the contract directly or indirectly touched the movement or disposition of the coal by the buyer after its delivery under the contract to purchase. Such buyer might have withheld all the coal thus purchased from the stream of interstate commerce, disposed of it in the state where it was bought, or in any other way exercised to the fullest extent every right appertaining to complete ownership of personal property. The law of July 2, 1890, cannot be so construed, or such a purpose be imputed to those who enacted it, as to strike with nullity the legal intrastate contracts which do not in purpose or effect directly relate to or touch "commerce with foreign nations or among the several states." No judgment of the Supreme Court sanctions such an interpretation. On the contrary, that court has always adhered to the doctrine that the manufacture and sale of commodities within a state are not within federal control under the commerce law, merely because such commodities may, as well as may not, after their manufacture or sale, become the subject of interstate commerce. These contracts were not for the sale of coal to be delivered in another state. They did not reach beyond the delivery of coal f. o. b. the cars at the breakers. If such coal afterwards entered the stream of interstate commerce, it was because the buyer chose that it should do so, and it was then within federal jurisdiction under the commerce clause of the Constitution. But the contracts by which the title to such coal was acquired, not relating to or affecting, except incidentally and indirectly, interstate commerce, are not amenable to federal control.

It is said, however, that these contracts were made pursuant to concert or agreement entered into among the purchasing coal companies. It might be a question whether such contracts, even if the result of concert and combination, were in restraint of trade. But the evidence does not satisfactorily establish the existence of such combination or concert. The contracts were made, not by all with all, or by all with one, but by the coal companies severally with individual operators. In all essential features, these contracts took the place of the expiring contracts, whose history and genesis we have summarized. They were the result of the natural development of the business and the peculiar

conditions pertaining thereto in the coal region during a long series of years, and so far from being in restraint of commerce, contributed largely to its orderly and healthy growth. That the price given was determined by the price obtained for similar coal at tide water in New York Harbor, did not impress an interstate character upon the contracts in question. It was merely the fixing of the standard by which the prices should be measured, and in no wise differed from the fixing of the price of such coal by the price obtained in San Francisco or Boston. In fact, the evidence is, that a large part of the coal so purchased was not taken to tide water at all, but was, to a considerable extent, disposed of in the state of Pennsylvania.

Nor does the mere fact that, during the long period when these contracts were in vogue, there was equality in the percentage offered and paid by the buyers to the sellers, or practical equality in the prices obtained by different defendants as sellers at tide water, argue any concert or combination denounced by the act of Congress. Equality in prices for staple articles given and received, is the general result of free competition among buyers and sellers. Of this, the grain markets and cotton markets of the world furnish signal examples. Nor can we attribute to the so-called 65 per cent. contracts an inherent illegality under the law, in the fact that they provide for the purchase by the coal companies of the whole product of the mine, whereas the percentage contracts prior to 1900 or 1902 were to continue only for a term of years. To buy the whole product of a mine is just as legitimate a transaction as to buy a portion of it. To buy the whole produce is just as legitimate as to buy the mine itself. And it is difficult to see how the 65 per cent. contracts directly affect interstate commerce, if, as seems clear to us, those to which they succeeded did not. A form of contract used for purchase and sale under these contracts has been shown. Uniformity in the framework of these contracts would seem to be the natural result of the situation, each seller demanding the terms that obtained among other sellers, and is no more evidence of concert or agreement, illegal or otherwise, than the uniform character of negotiable notes and bills of lading, as used in the business world. There is no evidence to show that the coal bought by the coal companies under these 65 per cent. contracts was not sold by them in competition with each other, just as it is proved all other coal owned or produced by them was sold, whether at tide water in New York City, or elsewhere.

Being clearly of the opinion that these so-called 65 per cent. contracts are not within the mischief denounced by the act of July 2, 1890, and have no proved connection with any general combination or conspiracy, as charged in the seventh paragraph of the bill, I think as to them the bill should be dismissed.

Nor can we agree that the abortive or abandoned attempts by the defendants, or some of them, to come to agreements or arrangements in 1876, 1884, and 1886, even if admitted to be of a character now denounced by the act of July 2, 1890, have any evidential bearing, remote or otherwise, upon the charge now being considered by the court. In the first place, the several acts referred to were legal when made. They certainly violated no act of Congress then in force; and in the

second place, were abandoned long before the passage of the act now under consideration.

If no general agreement or conspiracy in violation of the act has thus far been disclosed by the testimony, direct or indirect, it is hardly worth while to consider in this connection at any length, the separate acts of individual defendants or groups of defendants, so far as they are alleged to have been committed as steps in the development of the general illegal combination charged in the petition, and in furtherance of its illegal purposes. Nor do these separate acts constitute circumstances from which the existence of such general unlawful combination and agreement can be inferred. The alleged absorption by the Erie Railroad Company, in January, 1898, of the New York, Susquehanna & Western Railroad Company, even if it were held violative of the provisions of the act of July 2, 1890, on the part of the two companies concerned, has no relation whatever, necessary or otherwise, to any general conspiracy, such as is charged against all the defendants. The same observation is true, also, of the transaction in which the Reading Company acquired a majority of the shares of the capital stock of the Central Railroad Company of New Jersey, thereby, as alleged, uniting and bringing together under a common head and source of control, that company and the Philadelphia & Reading Railway Company. In fact, if all be true, as is alleged of these two transactions, they enabled these two groups of defendants to compete more efficiently with some of the other defendants. They certainly do not tend to prove the conspiracy which must be assumed, if they are to be considered as steps in the development or furtherance thereof.

A careful consideration of the very able argument and brief of the counsel for the government, does not convince us that the evidence discloses any such general contract, combination or conspiracy among the defendants in restraint of trade or commerce among the several states, or to monopolize any part of the trade or commerce among the same, as charged in the petition. Certainly there is no direct evidence of such a combination or conspiracy, and we think it is equally obvious, from what we have just said, that there is no indirect or convincing circumstantial evidence of the existence of such a conspiracy. The things herein charged are violations of law, and constitute the crimes denounced by the act. We refrain from saying that, on that account, the degree of proof of their commission should be that required upon the trial of indictments therefor. It suffices to say that the evidence should be such as to convince the mind of the tribunal to which it is addressed, that the acts denounced by the law have been committed. The consequences attending the finding of the defendants guilty of the acts charged in the petition in this proceeding, are certainly very serious, not only to the defendants, but to a large portion of the public and to many innocent persons involved in these transactions. As we have before said, this consideration can only be pertinent to invoke a more careful consideration of the testimony adduced in support of the charges made in the petition.

We are not unmindful that the conspiracies and combinations forbidden by the act may be proved otherwise than by direct and positive testimony of definitively formed agreements, and that it is a part of the

law of conspiracy, that "if there is a meeting of minds brought about in any way to accomplish the common purpose, the essentials of a guilty combination are all satisfied." We fail, however, to find in any of the acts and transactions disclosed by the testimony, evidence of any general combination or purpose to combine in violation of the provisions of the act continuing after the date of its enactment. Except as hereinafter stated, we cannot find, from any fair intendment of the act in question, a purpose to denounce general conditions and relations such as now exist among the parties engaged in the mining, selling and transportation of anthracite coal, whether intrastate or interstate in its character, disclosed by the evidence, as now existing since July 2, 1890, and we can impute no intention to the framers of the act to disturb such conditions.

To violate the act, there must be a contract combination or conspiracy, which in purpose or effect tends to restrain trade or commerce among the states, or to monopolize some portion thereof. Whether in purpose or effect violative of the act, such contract, combination or conspiracy must have the ordinary meaning attached to those words. There must be the meeting of the minds of two or more, to accomplish some common purpose directly violative of the act, or a purpose which will, whether intentional or not, in effect constitute a restraint of trade and commerce among the several states. In most of the cases under this act which have come before the Supreme Court, the existence of the contract, combination or conspiracy, has been either admitted or clearly and definitely proved, and the question of difficulty presented to the court was, whether the contract, admitted or proved, came within the purview of the act. In this case, however, we are met at the threshold with the denial of the existence of any such contract, combination or conspiracy, generally charged against all the defendants, and with what we think is a deficiency in the evidence adduced to support the same.

In the Addystone Pipe Case, 175 U. S. at page 235, 20 Sup. Ct., at page 105 (44 L. Ed. 136), the court say:

"We are thus brought to the question, whether the contract or combination *proved* in this case, is one which is either a direct restraint or a regulation of commerce among the several states or with foreign nations, contrary to the act of Congress."    (The italics are ours.)

Immediately thereafter, the court adopt the statement of special facts made by the learned circuit judge, in part, as follows:

"The defendants, being manufacturers and vendors of cast iron pipe, entered into a combination to raise the prices for pipe for all states west and south of New York, Pennsylvania and Virginia, constituting considerably more than three-quarters of the territory of the United States and significantly called by the associates 'pay' territory."

In the Northern Securities Case, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, of course the existence of the contract or combination, the result of which was the incorporation of the Northern Securities Company, for holding the stock of and controlling and managing two competing railroads, was not denied. Its terms and conditions and purpose were before the court, and were not the subjects of dispute or

controversy. The question argued before the court, and upon which the court divided, was whether this combination, admittedly existing, was within the purview of the act of Congress.

In Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, the case came up upon demurrer by the defendants to the petition, and the Supreme Court decided in effect, that the allegation as to the existence of a contract, combination or conspiracy, was sufficient.

In Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, the combination to "boycott" the interstate trade of a certain hat manufacturer in Connecticut, was admitted or clearly proved.

So far, we have considered the denunciation of agreements or combinations in restraint of trade as set forth in the first section, and combinations to monopolize any part of interstate trade, together, because both involve the agreement and combination of two or more persons to accomplish a common purpose, as above discussed.

Section 2, however, makes it an offense for any person to monopolize, or attempt to monopolize, any part of interstate trade or commerce. The monopoly feature of the act is covered by the charge of combination and conspiracy to monopolize, and the individual offense can only exist as to individual defendants. There must, however, be a clear, legal concept of the words "monopolize" and "monopoly," in order to properly consider the charge in this respect, as set forth in the petition. The word is hard to define, and no attempt at exhaustive definition need be made. It will suffice to say that the mere extent of acquisition of business or property achieved by fair or lawful means cannot be the criterion of monopoly. In addition to acquisition and acquirement, there must be an intent by unlawful means to exclude others from the same traffic or business, or from acquiring by the same means property and material things. As said by Judge Sanborn in U. S. v. Standard Oil Co., 173 Fed. 177:

"It (the anti-trust act) was enacted, not to stifle, but to foster competition, and its true construction is that, while unlawful means to monopolize and to continue an unlawful monopoly of interstate and international commerce are misdemeanors and enjoinable under it, monopolies of part of interstate and international commerce, by legitimate competition, however successful, are not denounced by the law, and may not be forbidden by the courts."

But, even if the proper interpretation of the word "monopoly" were as broad as contended for, as we have already said, we find no evidence to support the charge of an agreement, combination or conspiracy on the part of the defendants in that regard.

The Supreme Court has said that it was not the intention of the court to obstruct, trammel or interfere with the freedom of business, or with the necessary or lawful relations of those engaged in it. The situation in the anthracite region is a somewhat unique one. The territory in which the anthracite coal deposits are found is comparatively a restricted one, and the development of the business of producing, preparing for the market and transporting it, though necessarily affected by the peculiar conditions surrounding it, has had, on the whole, a natural, wholesome and beneficial growth. It cannot be that every phase in this development, which tends to the better regulation of a business engaged in by many operators, corporate and individual,

which incidentally but not directly affects the selling and transportation of coal in and to other states, in the absence of the unlawful purpose denounced in the act, can be visited with the serious consequences sought in this case to be visited upon the defendants. We have already commented on the fact that the development of this business has tended to eliminate from it the confusion, loss, and wasteful conditions which characterized the earlier period of its growth, in accordance with the natural laws which govern competition and reward intelligence and enterprise.

It has been said in many cases, and the brief of the United States admits, that mere acquisition of the material sources of wealth, and the enlargement of business and traffic, accomplished without the illegal combination or conspiracy denounced by the act is not unlawful. In the present case, it has resulted in a large percentage of the coal lands of the region being held by wealthy and powerful corporations who have the ability, and whose interest it is, to conserve those natural resources so valuable to the people of the whole country. The evidence of this case tends to show that these large holding and carrying companies do carry on their business in competition with each other; and there is nothing to show that there has been any general agreement or combination between them, verbal or in writing, in restraint of trade and commerce among the states, by a suppression of competition or otherwise, as is charged in the first clause of the seventh paragraph of the petition.

Counsel for the government insist that the cases in which the Supreme Court has discriminated between those acts of the state Legislatures which unlawfully invade the exclusive domain of federal regulation of interstate commerce, and those which do not, are applicable to the consideration of the present case. I think this is so only in a qualified sense. But, pursuing the argument on this line, we find that the Supreme Court has said repeatedly, that state legislation enacted without intent to regulate interstate commerce, is only unlawful if it directly and substantially interferes therewith, but not so if it affects interstate commerce only incidentally and not substantially. I find nothing in this case, either in the evidence in support of the general charge of conspiracy, or of the individual acts of the Reading Company, with reference to the stock of the Central Railroad Company of New Jersey, or of the Erie Company, with reference to the stock of the New York, Susquehanna & Western Railroad Company, by which there has been made manifest any purpose to restrain interstate commerce, or anything to show that the effect of these transactions has been to directly interfere therewith.

As to the Temple Iron Company transaction, in which seven of the defendants are involved, to wit, the Reading Company, the Central Railroad Company of New Jersey, Lehigh Valley Railroad Company, the Delaware, Lackawanna & Western Railroad Company, Erie Railroad Company, and the New York, Susquehanna & Western Railroad Company, it is charged, and the charge is supported by the proof, that the defendants named entered into a combination or conspiracy to defeat and prevent the building of a railroad and the construction of

an interstate route for the carrying of coal from the Wyoming region to tide water. The details of this transaction are fully set out in the opinions written by the other members of the court, and need not be here repeated. I agree with the conclusion reached in one of these opinions, that this so-called Temple Iron Company transaction involved a combination or conspiracy by the defendants above named, in violation of the act of July 2, 1890, as being in restraint of commerce among the states. It seems to me clear that an agreement was come to by the defendants named, which resulted in concerted action for the avowed purpose of bringing about an abandonment of the project of a route from the Wyoming coal field in the state of Pennsylvania, for the carriage of coal, to tide water in the state of New York. This avowed and conceded purpose rendered all that was done in pursuance thereof violative of the act of Congress in question, however innocent and legitimate it might have otherwise been. It is true, that the Simpson & Watkins collieries might have been innocently purchased by the defendants, separately or in combination, but as they were purchased in order to carry into effect the purpose of an unlawful combination, it seems to me the transaction was clearly within the denunciation of the law. The Temple Iron Company was the palpable instrument or means by which the unlawful purpose of the combination was accomplished, and its acquirement of the said collieries, in pursuance of that combination, must be held as illegal. I cannot think that the fact that the Pennsylvania charter of the proposed railroad—The New York, Wyoming & Western by name—only authorized its construction from a point in the Delaware river, in Northumberland county, Pennsylvania (being also the boundary line between the states of New Jersey and Pennsylvania), opposite or near Belvidere, New Jersey, and thence to a point in the Susquehanna river, within or near Pittston, Luzerne county, Pennsylvania, with the necessary branches or laterals, affects in any way the character of the combination charged as being illegal. It clearly appears from the evidence that a project for a railroad route from the coal fields in Pennsylvania to tide water in New York, was being discussed and ostensibly promoted by named parties interested in the coal regions, notably the firm of Simpson & Watkins, and that the charter above referred to had been obtained as a step towards the consummation of the purpose to construct such a route. I do not think we are called upon to consider and weigh the evidence, pro and con, as to whether the projectors of this route would or would not have been able to carry the same to completion. It matters not for present purposes whether the enterprise would have resulted, or not, in failure. The important fact is, that the defendants named, interested in the production and carriage of coal from Pennsylvania to tide water in New York, believed that the project of constructing such a route was a serious one, and that it induced them to combine, in order to thwart that purpose. The combination brought about the abandonment of the project, and the possibility of a competing road in interstate commerce was, for the time being, frustrated. I cannot escape the conclusion, therefore, that the decree of this court should denounce as illegal the combination by which this result was brought about, if a decree for an injunction, un-

der the prayers contained in the petition can be founded upon such denouncement.

The injunction or restraining order specifically prayed for in the petition should be granted, so far as it will serve "to prevent and restrain" the future or continuing violation of the act. This is the only jurisdiction conferred upon the court in such a proceeding as the one before us, and there can be no injunctive relief granted, unless it tends to restrain some specific future or continuing violation of the act.

BUFFINGTON, Circuit Judge (concurring and dissenting). I concur in the court holding the Temple Iron Company an illegal combination.

I dissent from its action in dismissing the bill as to the 65 per cent. contracts.

I restrict my opinion to discussing those two subjects.

I concur in the court's dismissal of the bill as to the other matters.

This petition, in the nature of a bill in equity, filed by the United States against certain railroads hereinafter named, and a number of other respondents, charges violations of section 1 of the act of July 2, 1890, entitled, "An act to protect trade and commerce against unlawful restraints and monopolies," which provides that:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal."

And section 2, which provides that:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor," etc.

The petition is filed in pursuance of section 4, which enacts that:

"It shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

The case is on final hearing, and its determination involves two questions, viz.: First, the meaning of the law; and, second, whether the facts proven fall within its prohibitions.

In taking up the first question, it is well to note that, the validity of the law being conceded. the court's duty is simply to declare its meaning and enforce its provisions, for whether the law itself is in the line of sound commercial policy and industrial progress is a legislative, not a judicial, question. It suffices to say Congress has passed it; the executive, in pursuance of its terms, seeks to enforce it; it remains for the court not to question the wisdom of the Legislature in enacting, or the executive in enforcing, but simply to declare its meaning and give effect to its provisions.

The first section uses broad, inclusive words. The object of the law is to prevent "restraint of trade or commerce among the several states"; and this is accomplished by making illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states." The

words "contract," "combination," "conspiracy," are clear, and "trade among the several states" is equally so. The coupling phrase "in restraint" would seem to be the only term open to question.

"Restraint" is a comprehensive word and covers the several individual kinds thereof described in—check; hinder; repress; curb; restrict. By the use of this broad phrase, "in restraint of trade or commerce," it would seem that one of the objects Congress had in view was the maintenance of that natural, free flow of commerce incident to its commercial, competitive character. We are therefore justified in holding that, although the word "competition" is not used therein, this act, as said in Chesapeake & Ohio Fuel Co. v. United States, 115 Fed. 610, 620, 53 C. C. A. 256, 266 (a case in which two of the present justices of the Supreme Court sat), was "aimed to maintain interstate commerce on the basis of free competition." Such being the case, and the Supreme Court has likewise held, we have an aid both to its construction and enforcement, namely, the object for which the law was enacted.

Turning now to the decisions of the Supreme Court, it was decided in the Northern Securities Case, 193 U. S. 337, 24 Sup. Ct. 457 (48 L. Ed. 679) that:

"The means employed in respect of the combinations forbidden by the anti-trust act, and which Congress deemed germane to the end to be accomplished, was to prescribe as a rule for interstate and international commerce, (not for domestic commerce), that it should not be vexed by combinations, conspiracies or monopolies which restrain commerce by destroying or restricting competition. We say that Congress has prescribed such a rule, because in all the prior cases in this court the anti-trust act has been construed as forbidding any combination which by its necessary operation destroys or restricts free competition among those engaged in interstate commerce; in other words, that to destroy or restrict free competition in interstate commerce was to restrain such commerce. Now, can this court say that such a rule is prohibited by the Constitution or is not one that Congress could appropriately prescribe when exerting its power under the commerce clause of the Constitution? Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine. Undoubtedly, there are those who think that the general business interests and prosperity of the country will be best promoted if the rule of competition is not applied. But there are others who believe that such a rule is more necessary in these days of enormous wealth than it ever was in any former period of our history. Be all this as it may, Congress has, in effect, recognized the rule of free competition by declaring illegal every combination or conspiracy in restraint of interstate and international commerce. As in the judgment of Congress the public convenience and the general welfare will be best subserved when the natural laws of competition are left undisturbed by those engaged in interstate commerce, and as Congress has embodied that rule in a statute, that must be, for all, the end of the matter, if this is to remain a government of laws, and not of men."

As further emphasizing free competition as the object of the statute, the court stated its preceding decisions established the proposition "that Congress * * * has prescribed the rule of free competition among those engaged in such commerce," and:

"We need only say that Congress has authority to declare, and by the language of its act, as interpreted in prior cases, has in effect declared, that the freedom of interstate and international commerce shall not be obstructed or disturbed by any combination, conspiracy, or monopoly that will restrain

such commerce, by preventing the free operation of competition among interstate carriers engaged in the transportation of passengers and freight."

Since, then, the object of the act is to conserve free competition in interstate commerce, we are justified in holding that the phrase, "in restraint of trade or commerce among the several states," forbids everything that restricts free competition in interstate commerce. This brings us to inquire whether any combination of that nature exists in this case.

The anthracite coal supply of the United States is practically limited to a small area of less than 500 square miles in northeastern Pennsylvania. Its consumption is general in other states; practically four-fifths of the entire output entering into interstate commerce in 1905. Six interstate railroads, hereinafter called the defendant carriers, to wit, Reading Company (owning the Philadelphia & Reading Railway Company); the Lehigh Valley Railroad Company; the Delaware, Lackawanna & Western Railroad Company; the Central Railroad of New Jersey; the Erie Railroad Company; and the New York, Susquehanna & Western Railroad Company—haul about 80 per cent. of the output and control all means of transportation from the anthracite field to New York Harbor, the principal market for anthracite coal, save relatively small territorial facilities of the Pennsylvania Railroad Company and the New York, Ontario & Western Railroad Company. These six defendant railroads are not only competitors with each other by virtue of the natural conditions incident to all common carriers, but being themselves, through their several subsidiary coal companies, hereinafter called defendant coal companies, buyers of coal from operators, producers of coal themselves, and likewise sellers of such bought and produced coal, they are in keen competition with each other not only in transporting, but in buying coal to originate freights and in selling it to realize profits. It will be observed that since 1895 the defendant railroads have through their subsidiary coal companies increased their coal holdings by 30,000 acres and from producing, in 1900, 68 per cent. of the total output, they produced 78 per cent. in 1907. The substantial identity of the several defendant railroads and their respective subsidiary coal companies is shown in the proofs. Take, for example, the Lehigh Valley Railroad Company and the Lehigh Valley Coal Company. The coal company's stock is all owned by the railroad company. No dividend has ever been paid upon it. The funds to operate it are advanced by the railroad company. Its present indebtedness to the latter is about $11,000,000. On this no interest is paid. Both companies have the same officers, and in its annual report the railroad company says:

"Under existing arrangements the Lehigh Valley Coal Company is compelled to depend upon the Railroad Company for working capital to carry on its operations."

In other words, the coal company is the subsidiary, corporate hand of the railroad company, and, while its corporate entity is separate, yet in work, profit, interest, and official personnel, it is but an alter ego of the railroad company itself. And such is the view taken of this relation by the courts. In Interstate Commerce Commission v.

Baird, 194 U. S. 42, 24 Sup. Ct. 568 (48 L. Ed. 860), the Supreme Court say:

"Here is a railroad company engaged at once in the purchase of coal through a company which it practically owns."

The anthracite field is divided into three regions, called the Lehigh, the Schuylkill, and the Wyoming or Lackawanna. In 1907, some 67,000,000 tons of anthracite were mined in these regions, of which over 17,000,000 were carried to New York Harbor. From 70 to 75 per cent. was produced by the defendant railroads through their coal companies, and the balance by individual operators. Their respective coal tonnages in that year were:

| | | |
|---|---|---|
| Philadelphia & Reading Railway Co. | 20.89 | |
| Central Railroad of New Jersey | 12.99 | |
| Lehigh Valley Railroad Company | 17.18 | |
| Delaware, Lackawanna & Western R. R. Co. | 15.25 | |
| Erie Railroad Company | 10.66 | |
| | | 76.97 |
| Delaware & Hudson Company | 9.78 | |
| Pennsylvania Railroad Company | 9.24 | |
| New York, Ontario & Western | 4.01 | |
| | | 23.03 |
| | | 100. |

Referring, for convenience, to the summary for relief at the conclusion of the government's brief, we may say that the first, second, and fifth grounds of relief refer to general acts in which all the defendant railroads are alleged to have joined, while the third, fourth, sixth, seventh, and eighth concern acts in which some but not all of the defendant railroads participated. Objection to the joinder of such rights of action was first urged upon the court at final hearing. Without entering upon a discussion of the authorities bearing on multifariousness, we content ourselves with saying the omission of the respondents to urge this ground until the final hearing was a waiver thereof, and while a court on such hearing may, of its own motion, dismiss a bill, it will not do so if that objection does not embarrass or prevent it decreeing relief. Without, therefore, holding this bill free from objection in that regard, we are of opinion, in view of all the circumstances attending the conduct of the case, that it should not be dismissed on that ground, and we accordingly address ourselves to the merits, and in doing so we confine ourselves to the Temple Iron Company transaction and the 65 per cent. contracts, taking up first the combination of these six defendant railroads through the Temple Iron Company, for in our opinion that transaction involves the broad, underlying right of these railroads to combine in matters of interstate commerce and, in connection with the perpetual 65 per cent. contracts, is the real gist of the controversy.

The specific relief asked for in the government's brief in that regard is:

"Fifth. That the Temple Iron Company is a combination of the defendants, Reading Company, the Central Railroad of New Jersey, Lehigh Valley Railroad Company, the Delaware, Lackawanna & Western Railroad Company, Erie Railroad Company, and the New York, Susquehanna & Western Rail-

road Company, in restraint of trade and commerce in anthracite, in violation of the said act, and every such defendant, and any subsidiary company or agent of either is enjoined from voting the stock of the Temple Iron Company, from receiving any dividends or other profits arising therefrom, and from exercising any control over the same."

This is based on subdivision "d" of paragraph 7, and is a condensed form of the fifth prayer of the bill, which, inter alia. is that the Simpson & Watkins collieries were acquired by the defendant railroads in pursuance generally of the combination charged in paragraph 7, "and specifically in pursuance of a combination or conspiracy between the defendants last named to defeat the construction of a competing railroad from the anthracite fields to tidewater, in violation of the aforesaid act of July 2, 1890."

A brief preliminary account of anthracite mining and marketing methods is helpful to an understanding of the case. We have seen that the sole means of transporting anthracite to market is by rail; that the defendant railroads, through the agency of their subsidiary coal companies, are themselves interested in mining coal, and in purchasing the coal produced by other mining companies and individuals, and in the sale of the same. The coal sold by the outside producer to the subsidiary coal companies is paid for on a percentage of the price coal commands at New York Harbor. Originally the coal producers' percentage of this was 40 per cent., but from time to time it has been increased to 65 per cent. The remaining 35 per cent. is the defendant railroads' share, which covers freight, selling expenses, and profit. The adjustment of these percentages has been a constant ground of contention between producers and railroads. An increase thereof has been urged by the former because of the greater cost of mining due to exhaustion, which compels a resort to deeper levels, and added expenses caused by pumping water therefrom; raising of miners' wages; shorter hours of labor; expense incident to safety laws, prevention of fires, and explosions; and finally to the high grade of coal preparation demanded by the public. It is, of course, also contended by the producers that the percentage retained by the defendant railroads gave them an undue freight rate. Without entering into a discussion of the merits of these contentions, it is to be noted that the difficulty that confronts both railroads and producers in the proper adjustment of their relative rights, and wholly without fault on the part of either, is complicated by the public market demand that the coal be prepared for use in such form as will meet the somewhat exacting demands of the purchasing public. In buying coal the public does not base its requirements so much on the real worth in heat units of the coal as on size and appearance. For example, the first breakage of coal which results in grate size is necessary. But the public demands a second breakage into smaller sizes, which is very expensive. Thus Mr. Sturges, a government witness, says:

"The expense of mining and preparing coal is very greatly added to by two requirements in our contract; the one compelling the breaking of our coal twice. There is a terrible loss on each breakage. The first breakage is necessary. * * * You cannot take those immense chunks of coal that come out of the mine and sell them in that way. That breakage reduces them to grate. If they could remain of the sizes made by the first breaking,

I think that coal could be sold at a profit 10 per cent. cheaper than it is to-day. The public will not take it, though; it has to be broken again. The dust, so far, is unsalable, although it is the purest of carbon."

Just what this requirement practically amounts to in dollars and cents Mr. Fuller shows:

"I could give you an approximate idea as to the less price received for coal by breaking it down. * * * One test we made was by taking 200 tons of grate coal, large coal, and breaking that down. The reason was that the market had got to a condition where it would not take grate coal. Figuring that coal on a basis of the price which was quoted at that time on that size, say $2 a ton, and breaking that coal down, which gave us the smaller sizes and culm, there was a loss of about $71 on the 200 tons."

The operators who sold their coal at the breakers to the subsidiary coal companies received, as we have paid, for some years 50 per cent. and then 60 per cent. of tide-water price. This left the carriers 50 per cent. and then 40 per cent. for freight and selling expense. The operators claimed the carrier received an undue share for freight, etc., and contended for a 65 per cent. rate.

The proofs show that in the early part of 1899 from 8,000,000 to 9,000,000 of operator's tonnage, which had been tied up on seven-year contracts with the subsidiary companies at 60 per cent., would expire. With a view to availing themselves of this fact, a number of operators in 1898 organized the New York, Wyoming & Western Railroad Company, which was empowered to build a line from the Susquehanna river near Pittston, the heart of the Wyoming region, to a point on the Delaware river opposite Belvidere, N. J. Its capital was subscribed for by independent operators, who pledged to it some 500,000 tons of output. Among its supporters was the partnership of Simpson & Watkins, which owned the controlling shares of eight collieries in the Wyoming region with a production of 1,300,000 tons, of which 500,000 tons were released by contract expiration. Mr. Sturges, the president of the road, testified that it was projected, "the same as all other organizations and movements of the independent operators, in the hopes of bettering their conditions, securing lower rates and a better market for coal—in fact, better net results for their business." Apart from the projected road's competitive effect in depriving the defendant railroads of the tonnage it might take from some of them, its retention of 35 per cent. instead of 40 per cent., to cover its freight, etc., for it proposed increasing the operators' price from 60 to 65 per cent. would have an unsettling effect on the tariffs of the other railroads. Its tendency would seem to be to cause competition among, as well as with, the defendant railroads themselves. We have seen that the northern division was served by eight railroads, whose tributary territory might be affected by the entrance of this ninth railroad. Moreover, at its eastern end at the Delaware river, the new road might make three of these defendant railroads, namely, the Delaware, Lackawanna & Western Railroad Company, the Lehigh Valley, and the Central Railroad of New Jersey, as well as the Pennsylvania Railroad Company, competitors for its freight to tide. It is now contended this new road was a paper project and would never have been built, and that, even if built, its charter would only carry

it to the border of Pennsylvania. But it is evident not only from what the defendant railroads actually did to prevent its construction, but from what they themselves say, that it was a possibly strong competitive factor to tide water, the elimination of which was necessary to preserve a noncompetitive status among these defendant railroads, the lines of several of which might be used as a connecting line to tide water from the terminus of the projected road. Mr. Thomas, then president of the Erie and the New York, Susquehanna & Western, and now president of the Lehigh Valley, testified in that regard as follows:

"A. * * * Simpson & Watkins, who were shippers on the line of the Erie and Lehigh Valley roads, as well as the Ontario & Western— Q. The Lackawanna also? A. Yes, they were shippers on the Lackawanna. They were, as usual, dissatisfied with the rates, thought they should have lower ones. We declined to lower the rates; they were reasonable. They got a lot of tonnage together, their own and that of other shippers, and threatened to build another road to the Delaware river opposite Easton. * * * Q. You understood at that time that the Simpson & Watkins' properties and those that were associated with them were seeking a market? A. I did. Q. And that the tonnage that was then tributary to the Erie Railroad might get away from it to some other railroad? A. There was every prospect that it would. Q. To either an existing railroad or some new railroad? A. Yes. Q. And it was the possibility of the loss of that tonnage that induced you to go in, as an officer of the Erie Railroad, to the Temple Iron Company transaction? A. It was. Q. And to protect the Erie Company? A. Yes, sir. Q. As to the Lehigh Valley, what were the motives that caused the Lehigh Valley to go into it? A. I do not know what their motives were, but I assume they were the same as mine. Part of the mines were on their lines, and I assume that they wanted to retain the tonnage they had. Somebody would have bought those properties, and it was better to buy them jointly and allow the tonnage to go to the roads that had formerly carried it, than otherwise."

These and other proofs that might be cited make it clear that the New York, Wyoming & Western Railroad Company threatened competition in the anthracite interstate trade in buying, carrying, and selling coal, and that which follows shows that such competition was defeated by a combination of the defendant railroads, which combination used the Temple Iron Company, a Pennsylvania corporation, as its instrument to preclude competition. This was done by the defendant railroads through such holding company buying the Simpson & Watkins' interests. The negotiations for such purchase were conducted by Mr. Simpson and by Mr. Bacon of the firm of Morgan & Co., Mr. Maxwell, then president of the Central Railroad of New Jersey, Mr. Thomas, then president of the Erie, and Mr. Twombly, then a director of the Philadelphia & Reading Railway Company and who was also financially interested in the Simpson & Watkins' interests; all being present. Mr. Simpson's testimony is:

"Q. When did you and Mr. Watkins sell out the interest in the collieries which you controlled to the Temple Iron Company? A. 1898 or 1899; I am not certain; nine or ten years ago. Q. Were you actively engaged, you personally, in the negotiations which led up to that sale? A. Yes, sir. Q. With whom did you negotiate? A. Robert Bacon, Esq. Q. Who is Robert Bacon, Esq.? A. A member of the firm of J. P. Morgan & Co. Q. What did J. P. Morgan & Co. have to do with the Temple Iron Company? A. Nothing that I know of. Q. What was Mr. Bacon's relationship to the Temple Iron Company? A. I was asked what I would take for the collieries, and we met one

afternoon, and Mr. Robert Bacon was there. I did not know whom he represented. The Temple Iron Company charter was bought afterwards, and we paid for it. Q. You met Mr. Robert Bacon somewhere? A. Yes. Q. Where was this? A. In Mr. H. McK. Twombly's office. Q. Where was that office? A. Mills Building here in New York City. Q. You met there Robert Bacon of the firm of J. P. Morgan & Co.? A. Yes, sir. Q. And he inquired what you would take for your collieries? A. Yes, sir. Q. Did you tell him? A. Yes, sir. Q. Follow the negotiations along. A. I told him. Q. Then what happened? A. He thought it was too·high, and we discussed it, and we said we would not take anything less. We said, 'We have 40,000,000 tons of coal in the ground, and we have a capacity of 7,500 tons a day. We can mine it for so much a ton and we will have so much money for it. We have got so much invested in improvements. If our figures about improvements are not right, we will take off half a million dollars.' He said: 'Would you be willing to submit to a technical examination?' We said: 'No, we will not. We will get up our figures and show them to you, and if you do not like it you need not take it. If we haven't got that much money invested, we will take off half a million dollars.' On that basis we showed our figures and they took it. The Temple Iron Company we did not know anything about. Q. When these negotiations were going on with Mr. Robert Bacon, you knew nothing about the Temple Iron Company? A. No. Q. It was with Mr. Robert Bacon of this firm of bankers here in New York City that you had the negotiations, and it was to him you showed these figures? A. Yes, sir. Q. Did he accept the proposition? ·A. I don't know that I showed him the figures, 'but I furnished the figures and somebody showed them to him. The deal was consummated. Q. Did Mr. Bacon accept your proposition? A. Somebody gave us the money. Q. I want to know where you and Mr. Bacon came to an agreement, if such a thing happened? A. Really I never saw him afterwards. Q. Whom did you see after that in connection with this matter? A. Nobody, except we went to the Guaranty Trust Company and got our money. Q. You did not know who supplied it? A. No. Q. Did the Guaranty Company pay you in cash? A. Check, and I very gladly indorsed it. I am awfully sorry now I took it. Q. You do not know whom Mr. Bacon represented? A. No. Q. You had not heard of the Temple Iron Company up to that time? A. No, sir. Q. What was your first information about the Temple Iron Company? A. I understood they had a charter that you could do almost anything under except commit murder, and they bought it for that purpose. Q. Who bought it? A. This crowd that was to buy our collieries. I do not know who bought it. Q. Did you know anything to do with the purchase of the charter? A. We paid for it. Q. Who is 'we'? A. Simpson & Watkins and our other partners paid $150,000 for the Temple Iron Company charter. Q. Simpson & Watkins bought the Temple Iron Company charter? A. I mean the crowd. I am not saying Simpson & Watkins did it, but we thought it was a good charter, and we bought it and used it. Q. Who was it that wanted it? A. I do not know. Q. For whom were you acting when you bought the charter of the Temple Iron Company? A. That was part of the deal. Q. Understood between you and Mr. Bacon? A. No, we thought we had a good charter and we would finance the company and turn in the stock, and we paid in a hundred and fifty-one thousand dollars for the charter and gave them four hundred and odd thousand dollars working capital and we took stock and bonds. Q. Who paid that hundred and fifty-one thousand dollars? A. I suppose it was paid out of what might be called a syndicate. Q. You do not know who the other members of the syndicate were? A. No. Q. Were you at any time president of the Temple Iron Company? A. Never. Q. Was Mr. Watkins? A. Yes, sir. Q. When? A. When it was formed and took over this property. He was president for one or two years. Q. What was the business of the Temple Iron Company prior to the time it was bought out by you gentlemen? A. It owned a little pig iron furnace. Q. Down in Reading? A. Near Reading. Q. What was the object in buying up that charter? A. Because it had a broad charter. Q. The purpose was to get the use of that charter? A. Yes. Q. Do you know what the capital stock of the Temple Iron Company was at that time? A. At that time? Q. Yes, sir. $240,000, do you remember? A. I do not know. Q. You paid

$151,000 for it.  A. Yes.  Q. Was the stock then increased with your concurrence and active assistance?  A. Surely.  Q. To what point?  A. I think $6,000,000.  Q. Did you take stock in it for your collieries, or were you paid cash for the collieries?  A. We took stock and cash and bonds."

Mr. Baer, president of the Reading, states he first heard of the purchase through Mr. Coster, a member of Morgan & Co., and his account is this:

"Mr. Coster, who was on the executive committee of the Reading Company, was exceedingly anxious that the Reading Company should join in the purchase of those properties. The purpose of it was to help the Erie; the situation was a financial one really.  J. P. Morgan & Co. had reorganized the Erie Railroad. They had just a year or two before taken hold of the Lehigh Valley. 1 had been their counsel and made the mortgages for the Lehigh Valley and fixed up that loan, called the general mortgage or consolidated mortgage, I have forgotten which. The Reading had just been taken out of the hands of the receivers, and when these collieries were offered for sale in New York the Erie people became very much alarmed. They were afraid of losing that tonnage, and, although it seemed to be tied to them, they argued that they might lose the tonnage and the Lehigh Valley would lose the tonnage and that would seriously affect those properties and the general financial condition of the country, so that our stock would be affected and all other stocks would be affected for the time being; that it would be a disturbing factor.  I protested personally that I could not see anything in the suggestion of building that railroad.  I did not see that it would amount to anything.  I did not believe in it at all.  It did not go to the New York waters, and I did not see how they could get coal to New York Harbor or to any other terminals so that they could be a serious factor.  To that the answer simply was that the mere threat of doing that would affect Erie securities and affect all the rest of us.  *  *  *  In the meantime the New York parties concluded that in some way they would take these collieries, whether we went in or not, and then I was called upon again to see in what way, if they did take them, a holding company could be created.  The usual suggestion was made in New York that they become a Jersey corporation; but as a Pennsylvanian I had been adverse to New Jersey getting jurisdiction over Pennsylvania property, and I have always tried in my business and in my practice to have Pennsylvania corporations hold Pennsylvania properties.  I think it is wiser and better to have the governmental jurisdiction where the property is.  I got thinking over it and just about that time my co-stockholders in the Temple Iron Company were very tired of the business and so was I.  It just occurred to me that that charter was the very one that would answer this purpose, and I sent for the Messrs. Smith and asked them whether they would sell their stock, and they said they would, at a figure that they named; and there was Frank Smith and Broden who had a few shares, a small interest in the company, and they all agreed.  After finding we could do that, I told the Reading people that the advantage to the Reading Company would not only be in having an interest in these coal properties, which were reported very valuable by this committee, but that it would insure the continuance of that Temple Furnace on the line of the Reading road, and that I was not sure that we would continue it long, that I was too busy to be bothering with running an anthracite furnace.  It was very important; how important it is you may understand when I say that a furnace on a railroad is about the best freight producing plant that you can have.  That iron furnace pays over on the average about $30,000—probably higher than that— a month freight on the inward freight alone.  The consumption of coal, of limestone, and ore, that we call the raw materials that go into a furnace for the smelting of iron, creates a great many tons, and, whilst the rates are not very high on those raw materials, the tonnage is very heavy.  We finally agreed on the part of the Reading Company that if the New York friends, Coster, insisted upon it, we would join them on one other condition, namely, that we should go in the syndicate.  I thought that probably there might be some money made in the syndicate, as there was, of course.  I mean that the

bonds were sold at a figure that was tempting. * * * ·Then we agreed simply to take the Simpson & Watkins collieries, and the question came up of guaranty. These people that were selling and the bankers who were to handle the bonds wanted what we called a joint guaranty. I did not want a joint guaranty with some of the companies that I did not think were quite as strong as we were, and the executive board of the Reading, Mr. Harris, and Mr. Welsh and Mr. Dickson, sustained me in that. Then the question was how to fix up the guaranty. I suggested that we take the tonnage of each of the companies that had gone in for the preceding year and divide that up and make that the percentage that each was to guaranty.

"By Mr. Reynolds: Q. The anthracite tonnage? A. The anthracite tonnage, and divide it up and that fixed the percentages. That was reported to the different presidents, and I suppose their boards took action; I do not know. They are all separate agreements. That is a matter of record."

The transaction was then carried out as theretofore arranged as follows: On January 26, 1899, the capital stock of the Temple Iron Company having been purchased as noted, its stock was raised to two and a half millions and its bonds issued for three and a half millions. On February 27th, Simpson & Watkins conveyed to it the capital stock of the eight collieries, taking in payment $2,260,000 of its capital stock and $3,500,000 of the bonds. On the same day they transferred to the Guaranty Trust Company, as trustee, this $2,260,000 of stock and $2,100,000 of bonds, and received therefor $3,238,396.66 in cash and certificates of beneficial ownership in $1,000,000 of the stock; the trustee purchasing from Mr. Baer for $151,603.34 the remaining $240,000 of original shares of the Temple Iron Company. On the same day, as part of the plan, the Reading Company, the Central Railroad of New Jersey, the Lehigh Valley Railroad Company, the Delaware, Lackawanna & Western Railroad Company, the Erie Railroad Company, and the New York, Susquehanna & Western Railroad Company, severally contracted with the Guaranty Trust Company and the Temple Iron Company to buy at par 29.96 per cent., 17.12 per cent., 22.88 per cent., 19.52 per cent., 5.84 per cent., and 4.68 per cent., respectively, in all 100 per cent., of the capital stock of the Temple Iron Company, and to guaranty the same percentages of its funded debt, principal and interest. These percentages as testified to by Mr. Baer, were arrived at on the basis of the respective anthracite tonnage of the several roads as quoted above. At the same time it was covenanted that, if in any period of six months the earnings of the Temple Iron Company should be insufficient to provide for its sinking fund, the interest on the bonds, and its "stock reserve" charge, the carrier-guarantors should pay the trust company up to 12½ cents per ton on every ton of coal carried by them from the mines of the company, and, if there still remained a deficit, it should be paid by the carrier-guarantors in the proportions noted above. Subsequently, on April 12th, each carrier entered into a supplementary contract with the trust company, to enable the latter "to take such action as may be necessary to enforce the terms of guaranty and the other covenants of said agreement of 27th of February, 1899, so as to work out equitable results and protect and safeguard the rights and obligations of * * * the several guarantors in the event of the failure of * * * any one or more of the guarantors to

comply with the terms of any such guaranty and to keep and perform the covenants in any such agreement."

The consummation of this plan effectually defeated the project of the new railroad and led to its abandonment, and it is to this the witness Sturges refers in his testimony:

"A few months afterwards, I cannot give the exact dates, a number of these collieries pledged to our road, or rather the stock in a number of these companies, and the collieries too, were sold. I only know to whom by hearsay, except in one case. That, of course, absolutely crippled our road."

Does this combination of all of the defendant railroads for the avowed purpose and with the effect of preventing the threatened building of a competitive road for the transporting of coal in interstate commerce fall within the ban of the statute? That the Temple Iron Company is a mere holding company, the instrument for effecting the purpose of the combination, is apparent from the proof, and indeed, as we have seen in the testimony of Mr. Baer, is conceded. The ownership of its stock was and is now in the defendant railroads, the Temple Iron Company being a mere convenient, unitary holding agency for joint, combining railroad interests. If this combination, which the proofs show was made by all these defendant railroads, is not within the prohibition of the statute, what legal bar is there to these railroads, through the agency of the Temple Iron Company, jointly and in combination, absorbing the remaining anthracite coal not now owned by their subsidiary coal companies? There is none. The gist of the statute is combination; combination "in restraint of trade or commerce among the several states." Indeed, there is a potency in the united members of a combination so far in excess of the aggregate of the separate disunited strength of its members that the law, apart from this statute, has not overlooked it. In Morris v. Barclay, 68 Pa. St. 173, 8 Am. Rep. 159, the Supreme Court of Pennsylvania, referring to a combination affecting a single region only of the bituminous field, which covers many thousand miles where the anthracite covers a few hundred, said:

"The effects produced on the public interests lead to the consideration of another feature of great weight in determining the illegality of the contract, to wit, the combination resorted to by these five companies. Singly each might have suspended deliveries and sales of coal to suit their own interests, and might have raised the price, even though this might have been detrimental to the public interest. There is a certain freedom which must be allowed every one in the management of his own affairs. When competition is left free, individual error or folly will generally find a correction in the conduct of others. * * * Men can often do by the combination of many what severally no one could accomplish and even what, when done by one would be innocent. * * * There is a potency in numbers when combined which the law cannot overlook, where injury is the consequence."

And it will be observed that it is the calling of this combination into existence the law strikes at, without awaiting the exercise of its powers. "It is no answer," said the Supreme Court of Ohio, in Central Company v. Guthrie, 35 Ohio St. 666, "to say that competition in the salt trade was not in fact destroyed, or that the price of the commodity was not unreasonably advanced. Courts will not stop to inquire as to the degree of injury inflicted on the public;

it is enough to know that the inevitable tendency of such contracts is injurious to the public." The purpose and effect of the combination of these defendant interstate railroads and of the defendant subsidiary coal companies would seem, therefore, to bring this transaction within the doctrine of the Northern Securities Case, 193 U. S. 197, 331, 24 Sup. Ct. 436, 454 (48 L. Ed. 679), where it was said "that every combination or conspiracy which would extinguish competition between otherwise competing railroads engaged in interstate trade or commerce is made illegal by the act," for the statute covers all combinations in restraint of interstate trade, whether by way of transportation or otherwise. It is no answer to this to say the Temple Iron Company has corporate power to hold the stock of mining companies. Concededly it has. The law forbids not the use, but the abuse, of the corporate powers of this Pennsylvania corporation. The question before us is not whether the Temple Iron Company had corporate pwer to own mines and mining stocks, but whether these six railroad companies have made the lawful corporate power of the Temple Iron Company to hold mines and mining companies' shares an instrument to enable them to jointly combine "in restraint of trade or commerce among the several states." If so, the act makes the combination unlawful without reference to the particular means used to effect the unlawful end. Indeed, to the contention that the Temple Iron Company was simply exercising its legal corporate powers it may be replied, as it was in Aikens v. Wisconsin, 195 U. S. 194, 25 Sup. Ct. 3, 49 L. Ed. 154, and reiterated in Swift v. United States, 196 U. S. 396, 25 Sup. Ct. 279 (49 L. Ed. 518):

"It is suggested that the several acts charged are lawful and that intent can make no difference. But they are bound together as the parts of a single plan. The plan may make the parts unlawful."

And of the office of this holding Temple Iron Company it may be here said, as was of the combination using the Northern Securities Company in that case, that it is one which "restrains interstate commerce through the agency of a common corporate trustee designated to act for both companies in repressing free competition between them." So, also, in Harriman v. Northern Securities Company, 197 U. S. 291, 25 Sup. Ct. 503 (49 L. Ed. 739), the court in speaking of the Northern Securities Case and that company said:

"Some of our number thought that as the Securities Company owned the stock the relief sought could not be granted, but the conclusion was that the possession of the power, which, if exercised, would prevent competition, brought the case within the statute, no matter what the tenure of the title was."

But it is urged that, because these eight collieries sell their product at the breaker, the transaction is wholly an intrastate act, and under United States v. Knight, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, the act does not apply. Let us look at the kernel and not the shell of this transaction. The stock of the collieries which sell is owned by the Temple Iron Company, and the stock of the Temple Iron. Company is owned by the defendant railroads. The latter are therefore the real sellers. And who are the real purchasers at the breaker? The

defendant coal companies whose stock is owned by the defendant railroads. And for what purpose do these latter buy this coal from themselves but to transport and sell the major part in interstate commerce? That the major part was interstate commerce the proofs show. Mr. Simpson, of the firm of Simpson & Watkins, says, referring to such product:

"Q. Where did you sell it when you sold it yourselves? A. In the general market—New York, Oswego, Buffalo—wherever we could get a market for it. * * * Q. What was your principal market while you were operating independently and selling in your own independent way? A. New York was the principal market. * * * Q. And with whom were you in competition in the markets in New York City and in other parts of New York state when you were selling coals on your own account? A. Everybody that was in the business. Q. Your principal competitors then were either the anthracite coal carrying roads, operating in their own name, or operating through coal companies which they controlled? A. The Delaware, Lackawanna & Western Railroad Company, the Lehigh Valley Railroad Company, and the Ontario & Western Railroad Company through Dickson & Eddy, their sales agent."

To the same effect is the testimony of E. B. Thomas, president of one of the carrier roads:

"Q. Where was the coal from the Simpson & Watkins' collieries moving at that time? A. Moved over all of those roads. Q. Where? To what point? A. All over, wherever they could find a market for it. Q. Was it coming to tide water? A. Some of it came to tide water. Some of it went west to different points."

And that railroad carriers are "instruments of commerce and their business is commerce itself" was held in United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007 So while in isolation this is a sale of the coal at the breaker by one corporation to another corporation—a local transaction—yet in combination it is but one of the elements in a chain whereby the six defendant railroads handle their joint produce in interstate trade—a product which might otherwise have gone to this projected road. The several acts which contribute to the final result must be judged not in isolation, but in combination. For, while it is said in the Addyston Pipe Case, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, that, "where the contract affects interstate commerce only incidentally and not directly, the fact that it is not designed or intended to affect such commerce is simply an additional reason for holding the contract valid and not touched by the act of Congress," it was also held that "any agreement or combination which directly operates, not alone upon the manufacture, but upon the sale, transportation, and delivery of an article of interstate commerce, by preventing or restricting its sale, etc., thereby regulates interstate commerce to that extent and to the same extent trenches upon the power of the national Legislature and violates its statute."

It is manifest, therefore, that while in corporate forms there are sales, corporate holdings, etc., which in isolation may be intrastate, the fact is equally clear that when combined the transaction as a whole falls within the domain of interstate commerce. For, as was said in Loewe v. Lawlor, 208 U. S. 301, 28 Sup. Ct. 301 (52 L. Ed. 488):

"Although some of the means whereby the interstate traffic was to be destroyed were acts within a state and some of them were in themselves as a part of their obvious purpose and effect beyond the scope of federal authority. still, as we have seen, the acts must be considered as a whole, and the plan is open to condemnation. notwithstanding a negligible amount of intrastate business might be affected in carrying it out."

Singly and uncombined these six defendant railroads may continue their lawful operations with that natural, untrammeled competition incident to individual rivalry; for, as we have seen above, "when competition is left free, individual error or folly will generally find a correction in the conduct of others." But it is when and because they unite—for the words "contract," "combination," "conspiracy," imply a coupling with others—and when that coupling is "in restraint of trade or commerce among the several states," that the federal statute becomes applicable.

It appears then by the proofs:

First. That the construction into the anthracite region of an additional competitive carrier of interstate commerce, the New York, Wyoming & Western Railroad, was threatened and feared.

Second. That the product of Simpson & Watkins' eight collieries entered largely into interstate commerce, and the diversion of this product and other interstate commerce was promised to and threatened to be divided by such new road.

Third. That the six defendant railroads combined to prevent the building of the competitive road, and the possible diversion of interstate commerce by the reorganization of the Temple Iron Company and the joint ownership of its stock, by purchasing through such company the stock of the Simpson & Watkins collieries, detaching such collieries from the support of the proposed road, thereby causing its abandonment and later removing the interstate product of such collieries for all time from the field of interstate freight competition, as they did in some cases when the perpetual 65 per cent. contracts were later agreed upon.

To us it is therefore clear that the combination of these six defendant railroads in the Temple Iron Company was a combination "in restraint of trade or commerce among the several states," and falls within the prohibition of the statute.

We are next brought to consider whether certain contracts, known as the 65 per cent. contracts, entered into between these railroads, through their subsidiary coal companies, with mineowners who are parties to this bill, were also "in restraint of trade or commerce among the several states." This part of the case is covered by the second ground of relief, set forth in the government's brief which is as follows:

"That the 65 per cent. contracts, so called, made by the defendants, the Philadelphia & Reading Coal & Iron Company, the Lehigh & Wilkes-Barre Coal Company, the Lehigh Valley Coal Company, the Delaware, Lackawanna & Western Railroad Company, and Hillside Coal & Iron Company, with the various producers who are before the court, for the control of their output, are in violation of the said act, and that all parties thereto, respectively, are enjoined from further carrying them out."

—being charged in clause "a" of paragraph 7 of the bill, and relief for which is asked in the petition's second prayer for relief.

The proofs before us show, and the Supreme Court in Interstate Commerce Com. v. Baird, 194 U. S. 42, 24 Sup. Ct. 563, 48 L. Ed. 860, held, that these contracts involved interstate commerce. The length of this opinion will not permit reference to the testimony, but it shows that the terms of these contracts were agreed upon by the joint action of the six defendant railroads, their subsidiary coal companies and mineowners, and that all of said persons and companies were concerned in and were thereby affecting interstate commerce. The form of contracts being thus agreed upon, they were thereafter entered into by individual mineowners and the subsidiary coal companies of the six defendant railroads on whose lines the mines were located. Under each of these contracts the entire product of a particular mine was sold until exhaustion to one of the subsidiary coal companies at the breaker, and shipments therefrom were only to be made as that company required. Not only had the owner no power to mine except as the buyer required, but he had nothing to do with fixing the price which was determined by the general tidewater rate. Save in operation the mine was practically owned by the subsidiary coal company, the only guaranty of production the operator had was that the coal company agreed "it will not discriminate in favor of its own mines, or that of any persons, firms or companies with which it had contracts to buy coal, but that the quantity to be ordered monthly shall be a just proportion of the entire quantity of coal agreed to be purchased by the buyer, measured by the colliery capacity of the respective sellers." It further appears that where similar contracts had been limited to seven years, as they usually had been up to that time, they had not precluded competition. Indeed, the expiration of such seven-year contracts had made possible the projection of two carrier roads, and the testimony shows that the perpetuity clause was insisted on and inserted in the contracts thereafter by the combined action of the defendant railroads and their coal companies in order to withdraw from competition for all time the freights of these producers. The result of the combination was the operators got a raise to 65 per cent., and the defendant railroads eliminated competition. It would therefore seem clear that the product of these mines, which had before entered into competitive interstate commerce, was withdrawn therefrom, and, such being the case, it follows that the instrument by which this was done, to wit, the contracts entered into in pursuance of joint action, was a combination, "in restraint of trade or commerce among the several states." It is contended, however, the right of contract is a personal, absolute one, and if a mineowner and a carrier agree thereto the law cannot interfere. But the answer to this is, we are here dealing with a combination, a combination of interstate carriers and owners of a product entering into interstate commerce, and, when such is the case, even the right to contract and combine must give way to a statute which declares that such contracts and combinations where "in restraint of trade and commerce among the several states" are illegal. It is but just to say that taking into consideration all the

factors involved in ownership, mining, transporting, and sale of coal, these contracts may on the whole be as fair, reasonable, and satisfactory a solution of the intricate economic questions involved as can be worked out. To quote from the testimony of an operator of long experience and broad-minded view:

"Q. Why did you think the railroads ought to purchase the individual operators' coal? A. I thought that was the best way to handle the business. Understand that anthracite coal is a domestic fuel and it is used in the winter time, and to get the dealer and the consumer to buy it through the summer time you have to give them some inducement. I talked to the railroad people a good many years. I said: 'The thing you ought to do is to buy the individual operators' coal at the mines on some agreed system, or price, or something of that kind, because we cannot induce the consumer to take our coal in the summer time and give the men full work through the summer time. We cannot get the dealers to stock up and we cannot afford to have yards and agencies all over, as you can.' "

But conceding the fairness, as we have said, of these contracts, the fact still remains they are at variance with the adjudged intent of the statute to maintain in interstate trade an untrammeled flow of commerce in obedience to free and unrestrained competition. That these contracts do restrain commerce is clear from their terms and effect, and if they do not fall within the ban of a statute "aimed," as was said in Chesapeake & Ohio Fuel Co. v. United States, supra, to "maintain interstate commerce on the basis of free competition," then that statute is made of no avail by contracts which shut out competition for all time, and which, if increased in number, may without absolute purchase and ownership end in the defendant railroads' acquisition of the remaining coal area. We are therefore of opinion these contracts, as they now stand, are illegal.

Seeing, then, that these six defendant railroads did unlawfully combine together, through the Temple Iron Company, and that thereafter in further combination they brought about these illegal perpetual contracts, the duty of the court seems clear to forbid them further maintaining their unlawful combination in the Temple Iron Company and from continuing these unlawful contracts; for, if the Temple combination was illegitimate in birth, when did the taint of illegitimacy leave it? The anti-trust act, as it seems to me, is directed not only at the illegal acts an illegal combination does, but also at the existence and continuance of such illegal combination. Moreover, in this case it is not only because the combination in the Temple Iron Company was originally illegal, but because it can be used in the future as it has been in the past, and because its existence to-day tends to forbid, prevent, and restrain competition, that this court should decree such illegal combination should end. And this case exemplifies the need of such a decree. · Following the absorption of the stock of the Simpson & Watkins collieries by the Temple Iron Company, the product of some of those collieries was, when the 65 per cent. contracts were afterwards determined on, bound in perpetuity to certain of these carriers through such contracts. By such perpetual contracts in their joint holdings and by the perpetual contracts these defendant railroads through their subsidiary coal companies severally made with other collieries these combiners withdrew, and still continue to with-

draw, such product, for all time, from competition, either in interstate transportation or sale. To my mind there is no more subtle and effective agency for the gradual, unnoted absorption by interstate carriers of the remaining interstate product than these perpetual contracts. Holding then that they are in the words of the statute "contracts * * * in restraint of trade or commerce among the states," I record my dissent to the action of the court in refusing to enjoin them.

LANNING, Circuit Judge. The government charges in its petition that the defendants have entered into a series of combinations or conspiracies in violation of sections 1 and 2 of "An act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890, hereinafter called the "anti-trust act." The allegations are that these combinations or conspiracies restrain interstate commerce and monopolize a part of such commerce in the sale and transportation of anthracite coal mined in the Wyoming region of Pennsylvania. The petition contains, in addition to the usual general prayer for relief, five specific prayers for the destruction of five of the combinations described. These combinations are: (1) The one by which, in 1898, the Erie Railroad Company, through an increase of its capital stock, acquired the capital stock of the New York, Susquehanna & Western Railroad Company; (2) the one by which the Temple Iron Company, in 1899, through an increase of its capital stock and an issue of bonds acquired the capital stocks, assets, and properties of what were known as the Simpson & Watkins Coal Companies, and by which the Reading Company, the Lehigh Valley Railroad Company, the Delaware, Lackawanna & Western Railroad Company, the Central Railroad Company of New Jersey, the Erie Railroad Company, and the New York, Susquehanna & Western Railroad Company simultaneously entered into contracts for the acquisition of the capital stock of the Temple Iron Company; (3) the one by which, in 1901, the Reading Company, through an increase of its capital stock and bonded indebtedness, acquired the capital stock of the Central Railroad Company of New Jersey; (4) the one by which, in 1900 and subsequent years, the defendant carriers and their subsidiary coal companies agreed, in a series of contracts known in the record as the 65 per cent. contracts, to purchase from certain other coal companies all the anthracite coal thereafter produced by the collieries of the latter companies; and (5) a combination or conspiracy, alleged to have been formed in 1895 by the defendant carriers and their subsidiary coal companies for the control of interstate commerce in anthracite coal, and in the development of which it is further alleged the four preceding combinations and one other (the one by which, in 1899, the Erie Railroad Company acquired the capital stocks of the Pennsylvania Coal Company and the Delaware Valley & Kingston Railroad Company) were used as "steps."

Two preliminary matters should be first disposed of; one a motion to dismiss the petition on the ground of multifariousness, and the other a motion to strike out certain parts of the proofs offered by the United States and objected to by the defendants.

Twenty of the defendants have raised, either by way of objections embodied in their answers or by simple motions to dismiss, the defense of multifariousness. This defense was not brought to the attention of the court until after the United States had concluded its testimony in chief. The court then postponed its consideration until the final hearing. It is clear, however, that the defendants who insist upon this defense stand in no better position now than they did when they first brought the matter to the attention of the court. It is the general rule of practice in courts of equity that a defendant loses his right to insist upon an objection that a petition or bill is multifarious unless he raises that defense by demurrer or plea or answer filed specially for that purpose. He cannot, by answering generally and omitting to plead or demur, require a complainant to take his testimony and then, after the expense of taking such testimony has been incurred, insist, as a matter of right, upon multifariousness as a defense. Such a defense is not to the merits of the case but to the form of the suit. It follows, therefore, that as a rule if it is possible for the court, where the defense of multifariousness is not regularly presented in one of the ways above stated, to make a decree which shall properly dispose of the issues involved, the petition or bill will not be dismissed. Veghte v. Raritan Water Power Company, 19 N. J. Eq. 142; Annin v. Annin, 24 N. J. Eq. 184; Bunnell et al. v. Stoddard et al., Fed. Cas. No. 2,135; Oliver v. Piatt, 3 How. 333, 411, 11 L. Ed. 622; Nelson v. Hill, 5 How. 127, 131, 12 L. Ed. 81; Hefner v. Northwestern Life Insurance Company, 123 U. S. 747, 751, 8 Sup. Ct. 337, 31 L. Ed. 309; Graves v. Ashburn, 215 U. S. 331, 30 Sup. Ct. 108, 54 L. Ed. 217. Assuming that the petition is multifarious and that the defense might have been sustained on a simple demurrer, there is no difficulty, except that of examining the evidence as to the several issues involved, in disposing of the case and entering a decree consistent, as we think, with its equities.

The motion to strike out proofs relates to certain exhibits and testimony. It is not necessary to pass upon this motion for the reason that, whether the proofs be in or out, the conclusions expressed in this opinion, at least, will remain the same.

Before entering upon a consideration of the nature and effect of the combinations here complained of, it may be well, also, to recall some of the expressions of the Supreme Court as to the kind of combinations that are condemned by the anti-trust act.

"The contract condemned by the statute is one whose direct and immediate effect is a restraint upon that kind of trade or commerce which is interstate." Hopkins v. United States, 171 U. S. 578, 592, 19 Sup. Ct. 40, 45, 43 L. Ed. 290.

"Where the subject-matter of the agreement does not directly relate to and act upon and embrace interstate commerce, and where the undisputed facts clearly show that the purpose of the agreement was not to regulate, obstruct, or restrain that commerce, but that it was entered into with the object of properly and fairly regulating the transaction of the business in which the parties to the agreement were engaged, such agreement will be upheld as not within the statute, where it can be seen that the character and terms of the agreement are well calculated to attain the purpose for which it was formed, and where the effect of its formation and enforcement upon interstate trade or commerce is in any event but indirect and incidental, and not its purpose

or object." Anderson v United States. 171 U. S. 604, 615, 19 Sup. Ct. 50, 54, 43 L. Ed. 300.

"An agreement entered into for the purpose of promoting the legitimate business of an individual or corporation, with no purpose to thereby affect or restrain interstate commerce, and which does not directly restrain such commerce, is not, as we think, covered by the act, although the agreement may indirectly and remotely affect that commerce." United States v. Joint Traffic Association. 171 U. S. 505, 568, 19 Sup. Ct. 25, 31, 43 L. Ed. 259.

"The purpose of the act of July 2, 1890, was to prevent the stifling and the substantial restriction of competition in interstate and international commerce. The test under that act of the legality of a combination or conspiracy is its direct and necessary effect upon such competition. If its necessary effect is but incidentally or indirectly to restrict competition, while its chief result is to foster the trade and increase the business of those who make and operate it, it is not violation of this law." United States v. Standard Oil Company. 173 Fed. 177, 188.

"If the necessary, direct, and immediate effect of the contract be to violate an act of Congress, and also to restrain and regulate interstate commerce, it is manifestly immaterial whether the design to so regulate was or was not in existence when the contract was entered into. In such case the design does not constitute the material thing. The fact of a direct and substantial regulation is the important part of the contract, and, that regulation existing, it is unimportant that it was not designed." Addyston Pipe & Steel Company v. United States. 175 U. S. 211, 234, 20 Sup. Ct. 96, 105, 44 L. Ed. 136.

1. Coming to the merits, the first question to be considered is: Was the acquisition, in 1898, by the Erie Railroad Company of the capital stock of the New York, Susquehanna & Western Railroad Company effected by a combination or conspiracy in restraint of trade or commerce among the several states, contrary to the provisions of section 1 of the anti-trust act, or promotive of a monopoly of any part of the trade or commerce among the several states contrary to the provisions of section 2 of that act?

On March 11, 1898, the Erie Railroad Company obtained from the New York, Susquehanna & Western Railroad Company a lease of the latter company's railroads, dated February 24, 1898, for the term of one year from March 1, 1898. The lease set forth, amongst other things, the purpose of the Erie to increase its capital stock by adding thereto $13,000,000 of first preferred and $13,000,000 of common stock and exchanging it, at the rates therein mentioned, for stock of the Susquehanna. On April 2, 1898, the Legislature of New Jersey consented to this lease. Between March 18 and June 30, 1898, the Erie Railroad Company acquired substantially all of the capital stock of the New York, Susquehanna & Western Railroad Company by exchanging its $26,000,000 of stock for the stock of the Susquehanna.

It is alleged in the petition that the Erie and the Susquehanna operate substantially parallel, and, in the absence of a restraining agreement or combination, competitive lines of railroad between the anthracite coal regions in Pennsylvania and tidewater points at New York Harbor, and that the Erie, by issuing its additional stock to the amount of $26,000,000 and exchanging it for the stock of the Susquehanna, brought the two formerly competitive railroad companies and their subsidiary coal companies under a common head and source of control and thereby, in violation of the anti-trust act, removed all inducements for competition between them and established a monopoly in interstate transportation and sale of anthracite coal. The answer

of the Erie denies that the two companies were ever in a true sense competitors, or that it has in any wise violated the anti-trust act, and avers that the Erie is one of the greatest carriers of western produce, that the Susquehanna has no such traffic, that both of the companies are carriers of anthracite coal to New York but from different sources of supply, that the Erie has a great freight and passenger business, that its terminal facilities at New York Harbor are inadequate, that the Susquehanna has larger tunnel and yard facilities at New York Harbor than it needs, and that the acquisition of the Susquehanna by the Erie enabled the Erie to use the tunnel and yard facilities of the Susquehanna. The answer of the Susquehanna also denies that the two companies are competitors for the transportation of coal, or that any competition between the two companies has been prevented or interfered with, or that the price of coal has by any of its agreements been in any manner controlled, and avers that the purchase of the stock of the Susquehanna by the Erie was made within the state of New York, that it was not in restraint of interstate trade or in violation of the anti-trust act, that, at the time of the exchange of stocks, the lines of the Erie were many miles distant from any territory in the coal regions served by the Susquehanna (though it is admitted that, since the purchase, by traffic arrangements with the Erie and Wyoming Valley Railroad Company, the Erie has reached some mines in the territory previously reached by the lines of the Susquehanna), and avers, further, that the two companies have continued to connect with and carry coal from different mines, except that the Susquehanna had received traffic previously carried over the lines of the Erie because of the greater convenience in delivering to purchasers.

In 1872 or 1873 the New Jersey Midland Railroad had been built from Jersey City, N. J., to Middletown, N. Y., a distance of 88 miles, and previous to 1883 it had passed under the management of the Susquehanna. The Erie was also then operating a road between the same points; both roads passing through Paterson and Passaic, in the state of New Jersey. Some time previous to 1883 the Susquehanna had extended its road to Gravel Place, three miles northwest of Stroudsburg, Pa. It then began to transport coal delivered to it at Gravel Place by the Delaware, Lackawanna & Western Railroad Company to West End, near New York Harbor, whence, in the absence at that time of a terminal of its own, it sent such coal over the lines of the Delaware, Lackawanna & Western to the latter's terminal at Hoboken, N. J. After the Susquehanna had acquired a terminal of its own at Edgewater, on New York Harbor, and extended its line through its ownership of the capital stock of a subsidiary company to Wilkes-Barre, Pa., both of which it did in 1893, its coal carrying business rapidly increased. The subsequent extension of its lines to Minooka in 1897, and its connection with the Delaware & Hudson Railroad, the Lehigh Valley Railroad, and the Central Railroad of New Jersey, in the Wyoming coal region, enabled it to declare in its annual report of June 30, 1897, that the completion of the road to Minooka placed the Susquehanna "in an independent position in respect to the transportation of coal." It was then in a position to

transport to its terminal at Edgewater coal from the mines tributary to the Delaware & Hudson Railroad in the valley between Wilkes-Barre and Carbondale, from the mines tributary to the Lehigh Valley Railroad in the same valley, and from the mines tributary to the New Jersey Central Railroad, as well as from the mines tributary to its own line. Though the Erie and the Susquehanna were free to extend their lines and thereby increase their business as common carriers of anthracite coal, it is clear that the more the business was thus increased the greater were the opportunities for competition between them. Each of them did, in fact, transport to New York Harbor coal from the collieries of the Pennsylvania Coal Company and the Hillside Coal & Iron Company. After the Susquehanna had put itself "in an independent position with respect to the transportation of coal," it and the Erie controlled lines which, without doubt, enabled them to compete in the procurement and the transportation of coal.

With such conditions existing prior to and at the time of the acquisition of the Susquehanna by the Erie, it is contended on behalf of the United States that the principles applied in Northern Securities Company v. United States, 193 U. S. 197, 326, 24 Sup. Ct. 436, 48 L. Ed. 679, are applicable. There it was held that the principal, if not the sole, object of the combination was to carry out the purpose of destroying competition between the constitutent companies and thereby to put a restraint upon interstate commerce. Here, however, it is argued, on behalf of the defendants, that the proofs fail to show any purpose of destroying competition or of promoting a monopoly in interstate commerce. The principal object of the combination, the defendants say, was to promote public convenience and interests, and that, conceding that the combination does eliminate the competition that previously existed between the two railroads, it is but an incidental restraint of interstate commerce.

The tabulated statements in evidence do not show the gross earnings of the Erie and the Susquehanna systems for 1897 or 1898. They do show, however, that the gross earnings of the Erie for the fiscal year ending June 30, 1900, were something over $38,000,000, and that the gross earnings of the Susquehanna for the fiscal year ending June 30, 1897, were but a little over $2,000,000. In 1898 the two roads reached Paterson, N. J., and Middletown, N. Y.; but the competition between them at those places was certainly very inconsiderable. More than one-half of the gross earnings of the Susquehanna was from freight on coal alone; the remaining part being from freight on merchandise, and from passengers, mail, express, and miscellaneous sources. Whatever of competition between the two roads there was, it was almost exclusively in the coal carrying business from the Wyoming region. The Susquehanna has no through freight business except as a coal carrier. It appears, too, that in 1898 the Susquehanna had larger terminal facilities at Edgewater, N. J., than it required at that point, that the terminal at Weehawken, about five miles south of Edgewater, was not an adequate one at that point for Erie's great and growing business, that the terminal facilities of the Susquehanna's freight business, exclusive of coal, in Jersey City and

New York, were restricted to small quarters in the terminals of the Pennsylvania Railroad Company, that the acquisition of the Susquehanna by the Erie enabled the Susquehanna to take its general freight business from the Pennsylvania's terminals to those of the Erie in New York, and that by the acquisition the convenience of both the Erie and the Susquehanna was promoted and the interests of the public subserved. The total amount of anthracite coal transported to New York Harbor over the Erie in 1907 was 1,346,414 tons. Since the Erie acquired the stock of the Susquehanna, the latter road has lost much of its tonnage of anthracite coal, not to the Erie but to the Delaware & Hudson Railroad, and Mr. Johns, the superintendent of the Susquehanna, says that the Susquehanna cannot now stand alone for the reason that, if its relations with the Erie were now severed, it would have no coal business left to it except that of a few mines which for ten months in 1908 produced only 216,310 tons.

The argument that the primary object or effect of the acquisition of the stock of the Susquehanna by the Erie was to suppress competition in interstate commerce between those two roads is not convincing. So many other roads reached into the anthracite fields of Pennsylvania and transported coal to New York Harbor that the elimination of competition between the Erie and the Susquehanna in the anthracite coal business could have had no substantial effect upon the business, or upon the price of coal at New York Harbor. That suppression of competition was not the principal purpose of the combination seems to be shown by the lease of the Susquehanna to the Erie of February 24, 1898, which declared that the closer connection between the two roads thereby proposed would be for the public benefit, as well as for their mutual advantage, and by the act of the Legislature of New Jersey of April 2, 1898, by which consent to the proposed combination was given on condition that "neither of the said railroad companies shall increase the present rate or rates of the freight or passenger traffic of the said companies in this state." I think the proofs show that, whatever competition between them was eliminated by the combination, such elimination was so inconsiderable a thing that it did not enter into the objects which induced the Erie Railroad Company to increase its capital stock by $26,000,000, and that it was but an incidental, and not the designed or principal, result of the combination. I conclude, therefore, that this combination is not violative of the anti-trust act.

2. The second question is: Was the scheme by which the Reading Company, the Lehigh Valley Railroad Company, the Central Railroad Company of New Jersey, the Delaware, Lackawanna & Western Railroad Company, the Erie Railroad Company, and the New York, Susquehanna & Western Railroad Company acquired the capital stock of the Temple Iron Company, and by which the Temple Iron Company acquired the capital stocks, assets, and properties of the Simpson & Watkins Companies, a combination or conspiracy violative of the anti-trust act?

Previous to 1899 the Temple Iron Company had been engaged in the manufacture of iron at Temple, near Reading, Pa. It had, how-

ever, a liberal charter which enabled it to own and operate mines. Having authorized its capital stock to be increased from $240,000 to $2,500,000, and its bonds to be issued to the amount of $3,500,000, or, perhaps, in anticipation of such authorization, it, on February 27, 1899, entered into a contract with Simpson & Watkins by which that firm agreed to sell all of the capital stocks, assets, and properties of the Forty Fort Coal Company, the Mount Lookout Coal Company, the Wyoming Land Company, the Wyoming Electric Light Company, the Babylon Coal Company, the Sterrick Creek Coal Company, the Edgerton Coal Company, the Hendrick Land Company, the Northwest Coal Company, and the Lackawanna Coal Company (the last a limited copartnership) to the Temple Iron Company, for $2,260,000 of the capital stock of the Temple Iron Company and the $3,500,000 of its bonds; the bonds to be secured by a mortgage or collateral trust deed. On the same day Simpson & Watkins agreed that simultaneously with their receipt from the Temple Iron Company of its stock and bonds above mentioned they would transfer and deliver to the Guaranty Trust Company of New York, as trustee, the whole of their stock of the Temple Iron Company ($2,260,000) and $2,100,000 of the $3,500,000 of its bonds, and the trustee agreed to pay to Simpson & Watkins $3,238,396.66 in cash and to issue to them certificates of beneficial interest in $1,000,000 of the stock. The trustee further agreed to purchase from Mr. Baer the remaining outstanding stock of the Temple Iron Company ($240,000) at 60 per cent. of its par value. It was also agreed that the trustee should have the power to sell beneficial interests in the stock; such interests to be expressed in certificates issued by the trustee to the purchasers. On the same day the Guaranty Trust Company, of the first part, and J. P. Morgan, and others, composing the underwriting syndicate, of the second part, entered into an agreement by which the parties of the second part agreed to purchase, on demand of the trustee, the $2,100,000 of bonds at the rate of 90 per cent. of their par value, and $1,500,000 of the certificates of beneficial interest in the stock (being the residue of such certificates after the delivery of $1,000,000 of them to Simpson & Watkins) at par. Also, on the same day, the Reading Company (holding all of the capital stock of the Philadelphia & Reading Railway Company), the Lehigh Valley Railroad Company, the Delaware, Lackawanna & Western Railroad Company, the Central Railroad Company of New Jersey, the Erie Railroad Company, and the New York, Susquehanna & Western Railroad Company each entered into a tripartite agreement with the Temple Iron Company and the Guaranty Trust Company of New York, by which the Reading Company and the five railroad companies agreed to purchase from the trust company, not later than December 31, 1906, at par value with interest at 6 per centum per annum from the date of the last dividend thereon, all of the trust company's shares of the stock of the Temple Iron Company, in the following proportions, to wit (the proportions being the same as the total tonnages of coal carried by them from all sources in the year 1898): The Reading, 29.96 per cent.; the Lehigh Valley, 22.88 per cent.; the Delaware, Lackawanna & Western, 19.52 per

183 F.—31

cent.; the Central, 17.12 per cent.; the Erie, 5.84 per cent.; and the New York, Susquehanna & Western, 4.68 per cent. In these tripartite agreements the Reading Company and the five railroad companies also severally agreed, that, if the earnings of the Temple Iron Company for any period of six months ending June 30th or December 31st should not be sufficient for the sinking fund and interest payments in the agreements provided for, and 3 per cent. on the par value of the stock of the Temple Iron Company, then each of the six companies would pay to the trust company, for the purpose of making up such deficiency, 12½ cents per ton for all coal carried by it from the Simpson & Watkins collieries for such period of six months, or so much of said sum as should be necessary to make up the deficiency, and, if there should still be a deficiency, then that each of the six companies would pay to the trust company such proportion of the remaining deficiency as should equal the proportion of stock agreed to be purchased by it. They also severally guaranteed, in the same proportions, the payment of the principal of the bonds at maturity, on January 1, 1925.

Thus was this combination effected. It went into operation, and, although the guarantor companies were compelled to pay to the trust company deficiencies in the earnings of the Temple Iron Company to the amount of $483,000 for the year 1899 and the strike years of 1900 and 1902, the business of the Temple Iron Company has been highly successful. On December 4, 1908, when Mr. Law testified for the government, the Temple Iron Company had purchased out of its net earnings for its sinking fund $1,900,000 of the bonds, the total issue of which was $3,500,000, and had a surplus of a million dollars in its treasury; and on June 30, 1909, when Mr. Thomas testified for the defendants, all of the bonds except $800,000 had been purchased by the Temple Iron Company and the $483,000 paid by the guarantor companies to the trust company had been refunded. In December, 1906, the certificates of beneficial interest in the stock of the Temple Iron Company, which the trust company had issued for the whole of the 25,000 shares, and which were widely scattered amongst about 200 holders in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, and Pennsylvania, were called in by the trust company, and, pursuant to the provisions of the tripartite agreements, the whole of the capital stock of the Temple Iron Company, excepting 50 shares held by the directors, was acquired by the Reading Company and the five railroad companies who agreed to purchase it, except that the Reading Company's proportion was divided between it and some of its subsidiary corporations.

It appears, then, that the Guaranty Trust Company no longer holds any of the capital stock of the Temple Iron Company. It does hold, however, the trust mortgage by which the bonds of the Temple Iron Company are secured. What the terms of that mortgage are does not appear, nor is the trust company a party to this suit. The Erie Railroad Company, in its answer, avers that:

"The Guaranty Trust Company is still the trustee of the mortgage which secures the payment of the bonds which have been purchased by numerous

bondholders, whose rights should not be impaired herein without bringing them, or their trustee, into this court as a party defendant."

A similar averment is contained in the answer of the New York, Susquehanna & Western Railroad Company. The issue of the $3,-500,000 of bonds is one of the acts by which the Temple Iron combination was made possible. The destruction of the combination may impair the value of the bonds. The trustee of the bondholders would therefore seem to be a proper, if not an indispensable, party. Nevertheless, this point is not urged in the briefs, and I shall rest my decision on other features of this branch of the case.

A general act of the state of Pennsylvania, passed April 15, 1869 (P. L. 1869, p. 31), provides:

"That it shall and may be lawful for railroad and canal companies to aid corporations authorized by law to develop the coal, iron, lumber and other material interests of this commonwealth, by the purchase of their capital stock and bonds, or either of them, or by the guarantee of or agreement to purchase the principal and interest, or either, of such bonds, provided that this act shall not apply to the stock and bonds of any corporation possessing mining or manufacturing privileges in the county of Schuylkill."

There is no allegation in the petition raising the question whether a common carrier engaged in interstate commerce, by the mere act of purchasing, for the purpose of securing its transportation business, the capital stock of a coal mining corporation also engaged in interstate commerce, monopolizes a part of that commerce, or restrains it, contrary to the provisions of the anti-trust act. If there were, then, since the contention of the government is that the defendant carriers by their purchase of the capital stock of the Temple Iron Company became the virtual owners of the mines whose capital stocks were owned by the Temple Iron Company, this court would, if it adopted that view, be required to consider one of the grave constitutional questions which the Supreme Court mentioned, but found it unnecessary to decide, in United States v. Delaware & Hudson Co., 213 U. S. 366, 29 Sup. Ct. 527, 53 L. Ed. 836, namely:

"Did the adoption of the Constitution and the grant of power to Congress to regulate commerce have the effect of depriving the states of the authority to endow a carrier with the attribute of producing as well as transporting particular commodities, a power which the states from the beginning have freely exercised, and by the exertion of which governmental power the resources of the several states have been developed, their enterprises fostered, and vast investments of capital have been made possible?"

Nor does the petition contain any allegation to the effect that the Reading Company, the Lehigh Valley Railroad Company, the Central Railroad Company of New Jersey, the Delaware, Lackawanna & Western Railroad Company, the Erie Railroad Company, and the New York, Susquehanna & Western Railroad Company, by purchasing the capital stock of the Temple Iron Company, which had simultaneously purchased the capital stocks of the Simpson & Watkins Companies, and by guaranteeing the payment of the obligations of the Temple Iron Company, created a combination in the nature of a copartnership for sharing the profits and losses of the Temple Iron Company, and that they thereby, in violation of the anti-trust act, monopolized a part of the interstate commerce in anthracite coal.

Such a copartnership is suggested, it is true, in the brief of the government; but no issue of that kind is presented by the pleadings. As neither of these two important questions is in issue, they cannot properly be decided in this case.

The only complaint in the petition concerning the Temple Iron transactions is that after Simpson & Watkins and certain other independent operators in the Wyoming and Lehigh coal regions had "determined and agreed to promote the construction of a new line of railroad from the regions where their mines were located to tide water," and after, for that purpose, they had "caused the New York, Wyoming & Western Railroad Company to be organized under the laws of the state of Pennsylvania," had secured "large subscriptions" to the capital stock of the company, had made surveys of its line, had purchased 7,000 tons of steel rails, and had secured pledges to it of "the tonnages of the aforesaid independent operators not already pledged by contract," the Reading Company, the Lehigh Valley Railroad Company, the Central Railroad Company of New Jersey, the Delaware, Lackawanna & Western Railroad Company, the Erie Railroad Company, and the New York, Susquehanna & Western Railroad Company, entered into the series of contracts of February 27, 1899, hereinabove mentioned, and thereby, through their concerted action: (1) Caused the construction of the projected New York, Wyoming & Western Railroad to be abandoned; and (2) pooled and divided amongst themselves (excepting the Reading Company) the tonnages of the eight Simpson & Watkins collieries. And the only prayer of the petition which specifically relates to the Temple Iron transactions, besides a prayer for injunction, is that we shall adjudge them illegal because thereby: (1) The Reading Company, the Lehigh Valley Railroad Company, the Central Railroad Company of New Jersey, the Delaware, Lackawanna & Western Railroad Company, the Erie Railroad Company, and the New York, Susquehanna & Western Railroad Company, through the instrumentality of the Temple Iron Company, acquired the Simpson & Watkins collieries "in pursuance of a combination or conspiracy between the defendants last named to defeat the construction of a competing railroad from the anthracite fields to tide water"; and because (2) "in so acquiring, through the purchase of agreed percentages of the capital stock of the Temple Iron Company, ownership in common of the aforesaid collieries formerly owned by Simpson & Watkins, the said Lehigh Valley Railroad Company, Central Railroad Company of New Jersey, Delaware, Lackawanna & Western Railroad Company, Erie Railroad Company, and New York, Susquehanna & Western Railroad Company pooled and divided among themselves the tonnages from those collieries, thereby shutting out competition in its transportation." These two questions—one concerning the alleged defeat and abandonment of the proposed new railroad, and the other concerning the alleged pooling and division of tonnages—are the only questions on this branch of the case presented by the pleadings, and the only ones this court is now at liberty to consider.

It appears that Simpson & Watkins and other independent operators of anthracite coal mines were promoting the new railroad with

the declared intention of securing access to tide water at New York free from the domination of existing carriers whose transportation charges were complained of. But the charter of the new railroad authorized its construction "from a point in the Delaware river in Northampton county, Pa. (being also the boundary line between the states of New Jersey and Pennsylvania), opposite to or near Belvidere, N. J., and thence to a point on the Susquehanna river within or near Pittston, Luzerne county, Pa., with the necessary branches or laterals." It is not pretended that the new road was to extend to tide water or even across the Delaware river into New Jersey. It is said in the government's brief that at the point opposite to Belvidere—that is, at the eastern terminus of the proposed new road in Pennsylvania—connection could have been made with the Delaware, Lackawanna & Western Railroad, the Central Railroad of New Jersey, the Lehigh Valley Railroad, and the Pennsylvania Railroad, all of which do reach tide water. It appears, however, that no arrangements of any kind had been made for any such connection. Mr. Edward B. Sturges, who was interested in the proposed road and subscribed for 500 shares of its stock, testified as follows:

"Q. The charter, or the articles of incorporation, only authorized this road to build a line as far as a point opposite Belvidere, N. J., did they not?

"A. That is all.

"Q. How was it contemplated to get from there to tide water?

"A. We had not actually entered upon the construction of any road from there on. We thought we could get the transportation over some road. We knew that getting across New Jersey might be beyond our power.

"Q. What roads would you have connected with?

"A. We could not tell. We never had made any arrangements at that time.

"Q. I do not mean what roads you could have actually entered into contracts with, but which you would have physically connected with?

"A. The Delaware, Lackawanna & Western Railroad across the river, the New Jersey Central and the Lehigh Valley and the Pennsylvania below the Belvidere division. We never got that far because we felt that if we could get over to the New Jersey line we could get to New York or to tide water later. Later there was another arrangement made."

This admission by Mr. Sturges, who was a witness called for the government, taken with the fact that it does not appear that there was any railroad whatever on the Pennsylvania side of the Delaware river at or near the point opposite to Belvidere with which any connection could have been made, shows that the allegation of the petition that the purpose was to construct a new road from the coal regions to tide water is not supported by the evidence. It is certain that the new road could not, under its charter, have reached tide water or extended beyond the confines of the state of Pennsylvania. It matters not that the independent coal operators had been threatening to build a new road from the coal regions to tide water, or what influence that threat had, if any, upon the formation of the combination which absorbed the collieries of Simpson & Watkins. The allegation is that the combination defeated the construction of a new railroad from the coal regions to tide water; the fact is that the construction of such a road was never authorized by law, or even contemplated, and, consequently, that it was not defeated. Furthermore, there is no proof in the case that the Temple Iron combination di-

rectly defeated the construction of any railroad whatever, either from the coal regions to tide water or from the coal regions to the Delaware river. It did not acquire the capital stock of the new railroad company and does not in any manner control its charter.

It may be observed, further, that the allegation of the petition is that the construction of the proposed new railroad has already been defeated and abandoned. The fourth section of the anti-trust act confers on Circuit Courts "jurisdiction to prevent and restrain" violations of the act. But this court cannot prevent or restrain a past violation of the act. There is no suggestion in the petition that the Temple Iron combination is still preventing the construction of the projected railroad. Nor does it appear that if the prayer for injunction should be granted the new railroad would be built. That prayer, in substance, is that the railroad companies shall be enjoined from voting on the stock of the Temple Iron Company which they own, and that the Temple Iron Company shall be enjoined from paying dividends to the railroad companies. It is not proposed to enjoin the Temple Iron Company from voting on the stocks of the Simpson & Watkins Companies, or to enjoin the Simpson & Watkins Companies from paying dividends to the Temple Iron Company. How would the present situation, in respect of the alleged defeat of the construction of the proposed new railroad, be changed by enjoining the railroad companies from voting on the stock of the Temple Iron Company and enjoining the Temple Iron Company from paying dividends to the railroad companies? The gravamen of the complaint is that the construction of the proposed new railroad has been defeated, and that thereby interstate commerce has been restrained. The injunction we are asked to issue cannot restore a condition under which the probability of a resumption of the efforts to build the new railroad will be in any wise increased. Neither can we frame an injunction that will restore such a condition under the general prayer for relief. The petition makes no case on which a more sweeping injunction than the one specifically prayed for can be allowed, for none of the seven Simpson & Watkins Companies is a party defendant, except the Mount Lookout Coal Company and the Lackawanna Coal Company, and each of those two companies is a party defendant only in respect of the 65 per cent. contracts hereinafter considered.

If, then, any relief can be granted, under the allegations of the petition, against the Temple Iron combination, it must be because there was a pooling and division of the transportation business of the Simpson & Watkins collieries amongst the Lehigh Valley Railroad Company, the Central Railroad Company of New Jersey, the Delaware, Lackawanna & Western Railroad Company, the Erie Railroad Company, and the New York, Susquehanna & Western Railroad Company. It is not charged that the Philadelphia & Reading Railway Company (whose capital stock is held by the Reading Company) obtained any part of the tonnage of those collieries. The fact is that none of the eight Simpson & Watkins collieries is tributary to the Philadelphia & Reading Railway Company. I understand, too, that none of them is tributary to the Central Railroad Company of New Jersey. They are located at widely separated points in the Wyoming

region. With one or two exceptions, each of them is tributary to a single railroad. The productions of the Northwest, Edgerton, and Sterrick Creek collieries are carried by the Erie, of the Lackawanna colliery by the Erie, the Delaware, Lackawanna & Western, and the New York, Susquehanna & Western, of the Babylon and Mount Lookout collieries by the Lehigh Valley, of the Forty Fort and Harry E. collieries (both owned by the Forty Fort Coal Company) by the Lehigh Valley and the Delaware, Lackawanna & Western. The proportions in which the six carriers (considering the Reading Company, the holder of the capital stock of the Philadelphia & Reading Railway Company, as a carrier) agreed in the tripartite contracts to purchase the stock of the Temple Iron Company were not fixed by the tonnages of the eight collieries alone. Had they been, the Reading Company and the Central Railroad Company of New Jersey would have acquired none of the Temple Iron stock. Those proportions were based on the total shipments of anthracite coal carried by the six carriers from all sources for the year 1898 (according to Mr. Baer) or for the five years from 1894 to 1898 (according to the contention of the counsel for the government). Neither in the tripartite agreements, nor elsewhere, does it appear that the productions of the eight collieries were thereafter to be carried by the six carriers in the proportions in which they agreed to purchase the Temple Iron stock. The conditions were such as to forbid the making of such a contract. And the tripartite agreements themselves show that no attempt to make any such contract was in the minds of the parties, for they assumed that the tonnages from the eight collieries over the several roads would vary from time to time, and therefore provided that if the earnings of the Temple Iron Company should be insufficient to meet its sinking fund, interest, and other charges, the carriers should make up the deficiency, not primarily in the proportions of stock agreed to be purchased by them, but by the payment by each carrier of a sum not exceeding 12½ cents per ton on such amount of coal as it should actually carry from the eight collieries. By this arrangement the Reading Company and the Central Railroad Company of New Jersey were exempt from such payments. Nor is there anything in the tripartite agreements, or in any other proven agreements, that shows that these six carriers have entered into an agreement not to compete with one another in the coal transportation business, or that forbids any of the carriers from extending its line to any or all of the eight collieries and transporting as much of the coal produced by them as it can get. Not only is any suppression of competition denied in the answers and by the defendants' witnesses, but they deny any purpose of bringing about such a result. The burden is on the government, therefore, to show that, under the combination, there was in fact a pooling and division amongst the carriers of the tonnages of the eight collieries. This it has failed to show.

3. The third question is: Was the acquisition, in 1901, of the capital stock of the Central Railroad Company of New Jersey by the Reading Company, effected by a combination or conspiracy in restraint of trade or commerce among the several states?

The petition alleges that about January, 1901, the Reading Com-

pany, which then held and still holds all of the capital stock of the Philadelphia & Reading Railway Company, issued additional shares of its capital stock to the amount of $3,017,650 of first preferred and $1,713,750 of second preferred, par value, and created an additional bonded indebtedness of $23,000,000, due in 1951, which it gave to the holders of the capital stock of the Central Railroad of New Jersey for 145,000, being a majority, of the shares of that stock, and thereby brought under one controlling power those two carrier companies, which, it is alleged, operated parallel and competitive lines. This, it is said, destroyed competition between them and their subsidiary coal companies and promoted monopoly. The answer of the Reading Company denies that the Philadelphia & Reading Railway and the Central are parallel or competitive lines, declares that they are connecting lines, admits that on or about January 7, 1901, it agreed to purchase 145,000 shares of the capital stock of the Central, and avers that, to secure the payment of the $23,000,000 of bonds which it issued to aid in financing the enterprise, it pledged the stock purchased from the Central, with other stock, as collateral, under an agreement dated April 1, 1901, which it executed and delivered, with the certificates for the stock, to the Pennsylvania Company for Insurances on Lives and Granting Annuities. The answer of the Central also denies that the two carriers operate parallel or competing roads, or that the scheme throttles competition or promotes monopoly.

In 1890 the Philadelphia & Reading Railroad Company, the predecessor of the defendant Philadelphia & Reading Railway Company, the most easterly point of whose line was at Bound Brook, N. J., 20 miles west of New York Harbor, determined to promote the construction of the Port Reading Road from Bound Brook to Arthur Kill, on the tide waters of the New York Harbor, in order to secure on that harbor coal terminal facilities of its own. The road was completed in 1892. Substantially all of the capital stock of the Port Reading Road was owned by the Philadelphia & Reading Railroad Company and passed, upon the sale of the latter's assets under the receiver's proceedings in 1896, to the defendant the Reading Company. The Reading Company, from 1896 to the present time, has held, as owner, substantially all of the capital stocks of the Philadelphia & Reading Railway Company and the Port Reading Railroad Company. By this extension the Philadelphia & Reading Railroad Company secured an outlet to New York Harbor for its coal. The terminal on Arthur Kill was not a convenient one for passenger or general freight traffic, and up to 1901, when a majority of the stock of the New Jersey Central was purchased by the Reading Company, nearly all of the traffic of the Philadelphia & Reading Railway Company going to and from New York, except its coal traffic, passed over the New Jersey Central between Bound Brook and New York. Prior to 1901 contracts between the Philadelphia & Reading Railway Company, the Central, and other roads, had been entered into for the establishment of joint through routes over their lines. These contracts largely benefited the Philadelphia & Reading Railway Company. In December, 1900, Mr. Baer, president of the Philadelphia & Reading Railway Company, was informed that a majority of the

capital stock of the Central Railroad Company of New Jersey was on the market for sale, and that the Baltimore & Ohio Railroad Company was a prospective purchaser of it. Fearing that, if the control of the Central should pass into the hands of the Baltimore & Ohio, the Philadelphia & Reading would lose the benefit of its contracts for joint through routes and be disastrously hampered in, if not excluded from, the use of the Central's New York terminals, he quietly bought the stock for the Reading Company. Evidently, the predominating motive in the purchase was to preserve to the Philadelphia & Reading its traffic arrangements with the Central. The direct effect of the purchase was to preserve them. The necessary effect of the combination was also to eliminate all possible competition between the Philadelphia & Reading and the Central in the anthracite coal carrying business. In the circumstances, however, such elimination, though a necessary result of the combination, was incidental to its main purpose and not in contravention of the anti-trust act as it has heretofore been construed. The argument that the Philadelphia & Reading and the Central were not competing but were connecting roads is not sound. To a certain extent they did supplement each other, but as the Port Reading road gave to the Philadelphia & Reading an outlet to New York Harbor for its coal carrying business, without the use of the Central's road, the Philadelphia & Reading and the Central were, previous to the combination, in the position of competitive carriers of coal even though they did not reach the same mines or the same parts of the Wyoming region. Mr. Baer himself said:

"Q. What do you regard as competitors of the Philadelphia & Reading now in New York Harbor, as to anthracite coal?

"A. All of the companies.

"Q. Won't you be good enough to name them for us?

"A. All the companies that ship to New York. They would be the Pennsylvania Railroad, the Lehigh Valley, the Delaware & Lackawanna, the Delaware & Hudson, the Erie, Ontario & Western. I guess they are all the roads leading to New York directly or indirectly.

"Q. Those roads are all carrying anthracite coal to the New York Harbor?

"A. Yes, sir.

"Q. And you regard them as competitors who must be considered in fixing rates?

"A. Yes, sir; unquestionably."

I prefer to base our opinion, not on the ground that the two roads were not competitors in the anthracite coal carrying business, but on the other, even though it be the narrower, ground that whatever suppression of competition resulted from the combination it was but an incidental effect of a scheme to save the business of the Philadelphia & Reading. Indeed, the elimination of competition between the Philadelphia & Reading and the Central, in the anthracite coal carrying business, was too small a thing to have been an important element in the object of the combination. The proximity of the lines of the Delaware, Lackawanna & Western, the New York, Susquehanna & Western, the New York, Ontario & Western, the Erie, and the Delaware & Hudson, to the line of the Central, and of the Pennsylvania's line to the line of the Philadelphia & Reading, left the competitive conditions in the coal carrying business very slightly affected by the elim-

nation of competition between the Central and the Philadelphia & Reading.

I conclude that this combination was not violative of the anti-trust act.

4. The fourth question is: Are the contracts, referred to in the record as the 65 per cent. contracts, contracts in restraint of interstate commerce?

The charge is that they are, and the prayer is that they be delivered up to be canceled, and that further operations thereunder be enjoined.

Long prior to 1869 the Delaware, Lackawanna & Western Railroad Company had been specially authorized by the Legislature of Pennsylvania to acquire and hold coal lands, and to mine, purchase, and vend coal. By a general act of that state, approved April 15, 1869, railroad and canal companies, as already stated, were authorized to aid corporations engaged in developing coal mines by the purchase of their capital stocks and bonds, or either of them. Pursuant to the policy of the state of Pennsylvania thus established, it appears that, before 1900, the Delaware, Lackawanna & Western Railroad Company had acquired coal lands, and that the Reading Company had acquired the capital stock of the Philadelphia & Reading Coal & Iron Company, the Lehigh Valley Railroad Company the capital stock of the Lehigh Valley Coal Company, the Central Railroad Company of New Jersey a majority of the capital stock of the Lehigh & Wilkes-Barre Coal Company, the Erie Railroad Company a majority of the capital stock of the Hillside Coal & Iron Company, and the New York, Susquehanna & Western Railroad Company a majority of the capital stock of the New York, Susquehanna & Western Coal Company. The Delaware, Lackawanna & Western Railroad Company and the above-mentioned subsidiary coal companies have each entered into one or more of the 65 per cent. contracts.

For many years previous to 1900, when the first of these contracts was entered into, many of the smaller coal producing companies sold the products of their mines to the larger coal companies, producing and shipping coal in their respective neighborhoods, for certain percentages of tide-water prices. These percentages were increased from time to time until they reached 60 per cent. In the early fall of 1900 a general strike of the coal miners and laborers of the whole anthracite region took place, resulting in an entire cessation of the production of anthracite coal. Conferences were had, and a ten per cent. increase in wages was finally granted by the defendant carriers' subsidiary coal companies to their employés. This increase, of course, affected the independent coal companies. On October 1, 1900, at a meeting of "individual operators," in Wilkes-Barre, Pa., a committee was appointed "to confer with the presidents of the transportation companies and endeavor to learn if there is to be a reduction in the rates of freight to cover the advance in wages that they have offered to their employés." On October 5, 1900, at another meeting, in Scranton, Pa., the committee reported a recommendation that the "individual operators," post the "notice of advance of wages already made by the companies." The minutes of this meeting then proceed as follows:

"After the reading of this report, Mr. Kemmerer [one of the members of the committee], in answer to the question as to what the presidents of the transportation companies had said regarding a reduction in the rates of freight to cover the proposed advance of ten per cent. in wages, said that the committee could not report a definite promise from them that there would be a reduction in the freight rates, but that they expressed their sympathy with the individual operators, and he intimated that they had said something would be done for the individual operators to improve the present conditions of the coal business."

The meeting resolved to post the notices, and then appointed a new committee of three persons "to confer with the various carrying companies relative to a new contract." This committee had a number of meetings with other gentlemen, who were officers of the defendant carriers and also of their subsidiary coal companies, in which there were negotiations concerning the terms of the proposed new contracts. The independent operators were demanding 65 per cent. The demand upon them was that, instead of having the contracts extend for a period of years, as the previous percentage contracts had done, they should continue for the life of their collieries. Mr. Cumming, vice president of the Erie Railroad Company and an officer of its subsidiary, the Hillside Coal & Iron Company, says that his reason for desiring the new contracts to cover the entire life of the collieries was "to have the question settled once for all." Other concessions were demanded of the operators. Finally, the form of contract now under examination was agreed on. It provides, amongst other things, that "the seller hereby sells and agrees to deliver on cars at the breaker to the buyer all the anthracite coal hereafter mined from any of its mines now opened and operated, or which may hereafter open and operate on the premises intended to be covered by this contract"; that "shipments shall be made from time to time as called for by the buyer"; that the buyer will "arrange to take the coal in as nearly equal daily or weekly quantities as in its judgment the requirements of the market will permit"; that the buyer will "use its best efforts to find a market for the seller's coal so as to enable the seller's collieries to be worked as many days as practicable with due regard to the general market conditions"; and that the buyer "will not discriminate in favor of its own mines, or any persons, firms or companies with which it has contracts to buy coal, but that the quantity to be ordered monthly shall be a just proportion of the entire quantity of coal agreed to be purchased by the buyer, measured by the colliery capacity of the respective sellers, it being understood that so far as practicable the quantity ordered shall not be less than a just proportion of all the anthracite coal which the requirements of the market may from time to time demand."

This proves conclusively that the representatives of the subsidiary coal companies did agree upon the form of the contracts before any of them were actually signed. They deny that in their negotiations with the committee of the "individual operators" they represented the defendant carriers. They say they represented only the subsidiary coal companies. Unquestionably, however, the carriers had an interest in the negotiations, and, as they were officers of both the carriers and their subsidiary coal companies, they must be considered as having

represented both. The form having been agreed on, the following contracts were entered into:

| Name of Seller. | Name of Buyer. | Date of Contract. |
|---|---|---|
| Green Ridge Coal Co. | Hillside Coal & Iron Co. | Nov. 1, 1900. |
| (1) Robertson & Law | " " " | " " |
| Jermyn et al. | N. Y. Sus. & West. Coal Co. | " " |
| Nay Aug Coal Co. | Hillside Coal & Iron Co. | Feb. 1, 1901. |
| Austin Coal Co. | L. V. Coal Co. | Mar. 26, " |
| Parrish Coal Co. | L. & W. Coal Co. | May 1, " |
| Red Ash Coal Co. | " " " | " " |
| Melville Coal Co. | " " " | June 1, " |
| Midvalley Coal Co. | L. V. Coal Co. | " 24, " |
| Lentz & Co. | " " " | " " |
| Temple Iron Co. | Hillside Coal & Iron Co. | July 1, " |
| Howe et al., Executors, | L. V. Coal Co. | " 9, " |
| St. Clair Coal Co. | P. & R. Coal & Iron Co. | " 12, " |
| Enterprise Coal Co. | " " " | " 17, " |
| Pine Hill Coal Co. | " " " | Aug. 17, " |
| Lackawanna Coal Co. | D. L. & W. R. R. Co. | " 27, " |
| Temple Iron Co. | L. V. Coal Co. | Sept. 20, " |
| Clear Spring Coal Co. | D. L. & W. R. R. Co. | " 21, " |
| Richard White et al. | P. & R. Coal & Iron Co. | Oct. 15, " |
| Buck Run Coal Co. | " " " | Mar. 12, 1902. |
| Raub Coal Co. | L. V. Coal Co. | May 1, " |
| (2) Delaware & Hudson Co. | Hillside Coal & Iron Co. | June 30. " |
| Geo. F. Lee Coal Co. | D. L. & W. R. R. Co. | Mar. 11, 1903. |
| Clarence Coal Co. | Hillside Coal & Iron Co. | " 23, " |
| Lackawanna Coal Co. | " " " | Oct. 21, " |
| Dolph Coal Co. | " " " | Apr. 14, 1904. |
| Coxe Bros. & Co. | L. V. Coal Co. | Mar. 29, 1906. |
| North End Coal Co. | D. L. & W. R. R. Co. | May 26, " |

(1) Canceled by mutual consent of parties on May 17, 1909.
(2) Expired April 1, 1908.

These facts seem to show that the custom of buying and selling coal on percentage contracts did not have its origin in any general agreement or concerted action on the part of the defendants. Rather does it seem that the contracts were the natural outgrowth of conditions attending the mining of coal. But the petition charges that there are special features in the 65 per cent. contracts, and such action concerning their adoption that, as to them at least, there was and is an unlawful combination or conspiracy. The substantial part of the charge is in the following language:

"Upon the termination of these contracts [the contracts which it is alleged were for terms expiring in 1900], the said defendant carriers, either directly or through the instrumentality of their said subsidiary companies and agents, the defendant coal companies, in pursuance of a previous agreement between themselves, severally offered to make and did make and conclude with nearly all the independent operators along their lines new contracts containing substantially uniform provisions agreed upon beforehand by the defendant carriers in concert, some of the operators contracting with one of the defendants and some with another, in which contracts the independent operators severally agreed to deliver, on cars at the breakers, to one or the other of the defendant carriers or its subsidiary coal company, as the case might be, all the anthracite coal thereafter mined from any of their mines now opened and operated or which they might thereafter open and operate, deliveries or shipments to be made from time to time as called for by the said carriers or their subsidiary coal companies; in consideration whereof

the said carriers or their subsidiary coal companies severally agreed to pay the independent operators for prepared sizes of anthracite 65 per cent. of the general average free on board prices of like sizes prevailing at tide-water points at or near New York, as computed from month to month, and for pea coal and sizes below that proportionately smaller percentages, declining as the sizes decline; and the defendant carriers controlling, as aforesaid, all the lines of transportation between the anthracite regions and tide water, save those of the Pennsylvania Railroad Company and the New York, Ontario & Western Railway Company, and therefore controlling the rates for the transportation of anthracite to tide water except in respect to the output of the limited number of collieries reached by the lines of the said Pennsylvania Railroad Company and the New York, Ontario & Western Railway Company, acting either directly or through the agency of their subsidiary coal companies, fixed the said percentages to be paid by them or their coal companies under said contract at a point that bore such a relation to the published rates of transportation that, taking for a basis the average tide-water prices of anthracite when the contracts were made and during many years previous (barring strike periods), the independent operator who entered into one of these contracts realized upon his coal from 15 to 50 cents more a ton, approximately (depending upon the length of the haul and variations in the tide-water price), than was realized by the independent operator who shipped his coal to tide water on his own account, paying the published rates of transportation himself, and sold it there in competition with the coal of the defendant carriers and their coal companies, which difference or advantage represents the amount per ton that the defendant carriers or their coal companies paid for the privilege of controlling the sale and disposition of the independent output so as to prevent it from selling in competition with the output of their own mines, as aforesaid. The result of this arrangement, as was intended, was to draw, if not to force, the great majority of the independent operators into making the aforesaid contracts, thereby enabling the defendant carriers and their subsidiary companies, the defendant coal companies, to control absolutely and until the mines are exhausted the output of most of the independent anthracite mines, and to prevent it, as aforesaid, from being sold in competition with the output of their own mines in the markets of the several states, particularly in the great tide-water markets."

In the brief of the government there are inserted tabulated statements intended to show that after deducting from the amounts received by the Lehigh Valley Coal Company for its coal shipped to New York Harbor between November, 1900, and December 1, 1901, and between January and December, 1907, the 65 per cent paid to the selling companies, the expense of selling, and the loss by wastage, the amounts remaining did not equal the published freight rates of the Lehigh Valley Railroad Company, the owner of its capital stock and over whose road the shipments were made. Other tabulated statements are intended to show the same condition as to coal purchased by the Philadelphia & Reading Coal & Iron Company and shipped over the Philadelphia & Reading Railway Company's line between November, 1900, and December, 1901. Assuming these tabulated statements, prepared under the direction of counsel and not verified by any witness, to be free from error, we fail to find any evidence of concerted action designed to bring about that result. We are dealing here with concerted action, with a contract, combination, or conspiracy, and not with individual unlawful transactions. If it is a fact that the Lehigh Valley Railroad Company is carrying coal for the Lehigh Valley Coal Company at less than its published rates, its conduct is violative of the act to regulate commerce of February 4, 1887, and its amendments, and may be corrected by a proceeding instituted before the Interstate

Commerce Commission or some court; but, to be violative of the antitrust act, the discrimination in favor of the Lehigh Valley Coal Company and against other coal companies shipping over the Lehigh Valley road must be the result of a contract, combination, or conspiracy in restraint of interstate commerce. It is not shown that the effect of these contracts was to require each of the defendant carriers to carry coal at less than its published rate. Nor are we satisfied that even in the case of the Lehigh Valley Railroad Company the tabulated statements in the government's brief, above referred to, are free from error. They assume that all the coal shipped to New York Harbor by the Lehigh Valley Coal Company in any particular month was sold during that month. Other possible errors in the statements are pointed out in the brief for the Lehigh Valley Railroad Company.

Nor does it appear that the conferees ever met after the form of the contracts was agreed on. The first three of the contracts, as we have seen, are dated November 1, 1900. No obligation was imposed upon any party to enter into one of them, but each independent operator was left free to do so or not as it might please. Consequently, it may be said, and in effect it is said, that there could have been no combination of carriers, or of their subsidiary coal companies, after November 1, 1900. But in 1907 the total production of anthracite coal in Pennsylvania was 76,836,082 tons. Of this amount 41,963,055 tons were produced by the Delaware, Lackawanna & Western Railroad Company, and the coal companies subsidiary to the Reading Company, the Lehigh Valley Railroad Company, the Central Railroad Company of New Jersey, the Erie Railroad Company, and the New York, Susquehanna & Western Railroad Company, and about 6,000,000 tons were produced by the selling coal companies that had entered into the 65 per cent. contracts. By these contracts the buyers (the subsidiary coal companies) were enabled in 1907, to add to the coal produced by themselves that produced and sold under the contracts. Not only have the buyers the right, under these contracts, to all the coal that the sellers' collieries shall ever produce, but they alone are the judges of the requirements of the market, they alone determine when calls for deliveries by the sellers shall be made, and they alone determine what shall be the sellers' "just proportion of all the anthracite coal which the requirements of the market may from time to time demand." Here is something more than mere acquisition of property. It is a plan for future acquisition of property and future regulation of the supplies to be furnished by the subsidiary coal companies and the selling companies. It is accordingly contended that the contracts between one of the buyers and its sellers are so related to the contracts between each of the other buyers and its sellers that all the contracts must be considered together as one series of contracts which were entered into and are maintained by a combination of buyers and sellers who thereby restrain interstate commerce and monopolize a part of it. We have seen that the form of the contracts had its origin in a conference of buyers and sellers in October, 1900. But all that the conference did was to agree upon the form, and when that agreement was reached its work was done. Nor is there any evidence showing that the con-

tracts are maintained by any combination whatever. On their faces, they are contracts between individual buyers and individual sellers. They are not contracts between or with any combination of buyers or sellers. Each buyer has the power to regulate only the supply furnished by its particular sellers. There is no joint power to regulate the supplies furnished by all the sellers. To grant the injunction asked for, namely, "that the said contracts be delivered up to be canceled, and that the defendants, their agents and servants, and all persons acting or assuming to act under their authority, be forever enjoined from further executing or carrying into effect any of the provisions of the said contracts, and from making or entering into any contracts of like character or effect hereafter," means, not that we shall enjoin acts which shall prevent an existing combination from continuing to restrain interstate commerce or to monopolize a part of it, but that we shall severally enjoin the parties who have entered into the 28 independent contracts hereinabove mentioned from operating thereunder. That would be to grant relief on a petition far more multifarious than any one has suggested the present petition to be. It presents no such multifariousness. Its purpose is to secure an injunction against these contracts on the ground that they were devised and are maintained by an unlawful combination. We do not find this ground of complaint supported by the evidence.

This conclusion renders it unnecessary to inquire whether the contracts, separately considered, are wholly intrastate contracts, as the defendants contend, or whether, separately considered, they are in restraint of interstate commerce, as the government's counsel contend. In either case, no relief can be granted in this proceeding, for, while the anti-trust act condemns all contracts as well as all combinations in restraint of interstate commerce, we are not here asked to award a series of injunctions against defendants who have entered into and are maintaining a series of separate and independent contracts which are in restraint of interstate commerce, but to enjoin an alleged combination from further maintaining a series of alleged unlawful contracts. As no such combination exists, no relief, in respect of the 65 per cent. contracts, can be granted.

5. The fifth question is: Do the facts show a general combination or conspiracy in restraint of interstate commerce?

The charge is that, under the influence of competition, the average price of stove coal declined from $4.15 and $4.19 a ton in 1892 and 1893 to $3.60 a ton in 1894 and $3.12 a ton in 1895. "Whereupon," says the petition—that is, in 1895—"the defendant the Reading Company and the defendant carriers and the defendant coal companies, owning or controlling 90 per cent., more or less, of all the anthracite deposits, and producing 75 per cent., more or less, of the annual anthracite supply, and controlling all the means of transportation between the anthracite mines and tide water, save the railroads operated by the Pennsylvania Railroad Company and the New York, Ontario & Western Railway Company, which, as aforesaid, reach only a limited number of collieries, entered into an agreement, scheme, combination, or conspiracy, by virtue whereof they acquired the power to con-

trol, regulate, restrain, and monopolize, and have controlled, regulated, restrained, and monopolized, not only the production of anthracite coal, but its transportation from the mines in Pennsylvania to market points in other states, with the result that competition in the transportation and sale of anthracite coal has been wholly suppressed and the price thereof to consumers greatly enhanced." It is further charged that:

"As steps in the development of this illegal combination, and in furtherance of its illegal purposes, the defendants herein named, or some of them, engaged in and became parties to the following additional acts, schemes, and contracts, among others, in violation of the aforesaid act of July 2, 1890."

The additional acts, schemes, and contracts described in the petition are the four combinations already considered and one other, namely, that in the year 1899, after the abandonment of the projected New York, Wyoming & Western Railroad, and after the Pennsylvania Coal Company had caused to be organized, under the laws of the state of New York, the Delaware Valley & Kingston Railroad Company, the Erie Railroad Company, through the agency of the banking house of J. P. Morgan & Co., and in violation of the anti-trust act, acquired nearly all the capital stock of the Pennsylvania Coal Company and the Delaware Valley & Kingston Railroad Company, and thereby defeated the construction of the proposed railroad of the Delaware Valley & Kingston Railroad Company from the Wyoming region to tide water.

I have not separately considered the charge that the Erie Railroad Company's acquisition of the capital stocks of the Pennsylvania Coal Company and the Delaware Valley & Kingston Railroad Company created an unlawful combination for the reason that there is no specific prayer in the petition for relief as to that particular transaction. It seems to have been embodied in the petition merely because it was supposed to have been one of the "steps" in aid of the alleged general combination or conspiracy. Nor have I separately considered the acquisition, in 1905, of the capital stock of Coxe Bros. & Co. by the Lehigh Valley Railroad Company, concerning which much is said in the proofs and the briefs, for the reason that it is not mentioned in the petition, and must therefore be considered merely as a part of the proofs relating to the general charge.

What we are asked to do is to find that in 1895 the defendants "entered into an agreement, scheme, combination, or conspiracy" of the broad sweep above mentioned, and that in the development of it they used "as steps" the Erie and Susquehanna combination of 1898, the Temple Iron combination of 1899, the Erie and Pennsylvania Coal Company combination of 1899, the combination formed through the instrumentality of the 65 per cent. contracts in 1900, and the Reading and Central combination of 1901. We are also asked to consider the acquisition of the capital stock of Coxe Bros. & Co. by the Lehigh Valley Railroad Company, in 1905, as an element of proof to support the 'charge of a general combination or conspiracy. But there is no satisfactory proof that these combinations were parts of or steps to a scheme, entered into by the defendants generally, for the control of the anthracite coal business. They were independent combinations,

the first of them having been created three years, and the last ten years after it is alleged the general combination or conspiracy was formed. What "contract, combination in the form of trust or otherwise, or conspiracy," for example, existed amongst the defendants generally for the purchase by the Reading Company of the capital stock of the Central? These combinations cannot be tied together in one gigantic trust or conspiracy without proof. They have no common board of control, no common scheme of managing their affairs, and no common business interests. Each of them is wholly separate from and independent of the others. I am satisfied that the proofs fail to show the existence of a general combination or conspiracy of the nature set forth in the petition.

Finding no ground, under the petition as it is framed, on which any part of the relief prayed for can be granted, I think a decree should be entered dismissing the petition on the merits as to the first, third, fourth, and fifth combinations above mentioned. As to the second combination, the one known as the Temple Iron combination, I think the petition should be dismissed without prejudice.

PER CURIAM. The result of the foregoing opinions is that the court unanimously agree that the petition should be dismissed: (1) As to the charge in paragraph 7b of the petition concerning the acquisition by the Erie Railroad Company of the capital stock of the New York, Susquehanna & Western Railroad Company; (2) as to the charge in paragraph 7c concerning the acquisition by the Reading Company of the majority of the capital stock of the Central Railroad Company of New Jersey; and (3) as to the general charge of a combination or conspiracy in violation of the anti-trust act of July 2, 1890, in the development of which it is charged the other combinations set forth in the petition were used, as steps, set forth in paragraph 7 of the petition.

A majority of the court hold that the petition should be dismissed as to the charge in paragraph 7a of the petition concerning the so-called 65 per cent. contracts.

A majority of the court also hold that the charge of an illegal combination in respect of the matters relating to the Temple Iron Company set forth in paragraph 7d of the petition should be sustained, and that the injunction or restraining order specifically prayed for in the petition should be granted so far as it will serve to prevent and restrain a continuing violation of the act.

Counsel will be heard as to the form of a decree.